LAUREN G. HEMPHILL, Respondent, v DAVID G. HEMPHILL, Appellant.

Second Department, June 24, 1991

### APPEARANCES OF COUNSEL

*Fink Weinberger, P. C. (Barbara Ellen Handschu, Henry S. Berman, Neil A. Fredman, Alton L. Abramowitz* and *Sandra B. Edlitz* of counsel), for appellant.

*Shea & Gould (Jacalyn F. Barnett* of counsel), for respondent.

### OPINION OF THE COURT

KUNZEMAN, J.

On this appeal, the noncustodial parent maintains that his right to meaningful visitation with the parties' children would, in effect, be eliminated by his former wife's relocation of the children to London, England, where her new husband resides. Conversely, the plaintiff argues that the trial court properly found that her remarriage constituted an "exceptional circumstance" and that the relocation of the children to London was in their best interests. It is well settled that if exceptional or compelling circumstances prompt the move, the ultimate governing standard in cases of this nature is not the convenience of the parents but, rather, the best interests of the children. At the outset, a review of the underlying facts, which are essentially uncontroverted, is in order.

The parties were married in May 1977 and have two issue, who are currently 9 and 7 years old. After a three-week trip to London, during which she was auditioning as a singer, the plaintiff informed the defendant in August 1986 that she wanted a divorce. The parties initially worked out an informal agreement by which each one would be independent, notwithstanding the fact that they would continue to reside together in the marital residence in Westchester County. On April 7, 1988, the parties entered into a separation agreement which directed, *inter alia,* that the former marital residence in Mount Kisco be sold, that the plaintiff have custody of the children, with liberal visitation rights for the defendant, and that the defendant pay maintenance and child support to the plaintiff. The separation agreement, which was negotiated by the parties with their respective counsel, contained no radius clause limiting the custodial parent's right to relocate.

Shortly after the divorce became final, the defendant moved out of the marital residence. After the marital residence was sold, the plaintiff moved to Lawrenceville, New Jersey, in order to be near her parents, and because she allegedly could not afford to reside in Westchester County. As a consequence

of the increased distance between the parties, the plaintiff adopted a routine of bringing the children to the Yale Club in Manhattan on Fridays so that the defendant could pick them up there for their weekend visitations. On Sundays, the plaintiff would meet the defendant and the children in Manhattan and then drive home to Lawrenceville. This arrangement allegedly ceased when the defendant raised an objection to the plaintiff's plan to relocate with the children to London.

In May 1989 the defendant moved to enjoin the plaintiff from moving to London with the children. In the alternative, he sought a change of custody from the plaintiff to himself in the event that the plaintiff made the move to London. Simultaneously, the plaintiff commenced an action in New Jersey for permission to relocate to London with the children. The jurisdictional issue was apparently rendered moot when the plaintiff agreed to submit the controversy to the New York courts, despite an apparent defect in service of the New York papers by the defendant.

During the pendency of this action, the plaintiff married John Goldsmith in July 1989. While the defendant's motion was pending, the plaintiff and the children established residence in her parents' home near Trenton, New Jersey.

In August 1989 Justice Miller appointed Dr. Laurence Loeb as psychiatrist and Virginia Knaplund as Law Guardian. Both the psychiatrist and the Law Guardian recommended that custody remain with the plaintiff, with liberal visitation with the defendant. In his written report, Dr. Loeb unequivocally set forth his finding that neither parent is unfit and that it is in the best interests of both children to have frequent access to both parents. Dr. Loeb further noted that "[a]lthough both children love both parents, my impression is that they see their mother as being the more emotionally nurturing". The Law Guardian emphasized the fact that the plaintiff had been the children's primary caretaker since birth.

After a lengthy hearing, the Supreme Court denied the defendant's motion. The order modified the visitation provisions of the parties' separation agreement to the extent of awarding the defendant visitation for 6 weeks during the summer and 4 out of the 5 school vacations during the year. It further directed that the plaintiff incur the expenses for the children's round-trip travel, as well as one round-trip airfare per year for the defendant, should he elect to visit the children in England.

In an accompanying memorandum decision, the court found that the plaintiff's remarriage to John Goldsmith, a reinsurance broker for the Lloyds of London Insurance Companies, who was chief executive officer of his company with an annual salary of approximately $200,000, and whose "business and livelihood depend upon his living and working in England", constituted an exceptional circumstance within the meaning of controlling case law. The court also made a finding that the best interests of the children dictated that the plaintiff remain the custodial parent and be allowed to relocate to London with them. It was emphasized that "[t]his conclusion is reached only with great difficulty and with no intent to cast aspersions on defendant's fitness as a parent or his devotion to his children".

The defendant now appeals from this determination. Under the particular circumstances of this case, we find that the defendant's motion was properly denied.

It bears emphasis, at the outset, that the key factor with respect to custody and visitation issues is the welfare of the children. Whenever possible, the best interests of a child lie in being nurtured by both natural parents *(see, Daghir v Daghir,* 82 AD2d 191, 193, *affd* 56 NY2d 938). As the Court of Appeals has ruled, where the physical and emotional well-being of a child is concerned, it is anomalous that his or her protection should be made to depend upon the vindication of the rights of the parents. Moreover, while legal custody may reside with one or both of the parents, the placement of custody with one does not necessarily terminate the role of the other as psychological guardian and teacher *(see, Weiss v Weiss,* 52 NY2d 170, 174-175).

In addition to the overarching rights of the children and the interests of the noncustodial parent, custodial parents have rights as well. Among the latter is the right to remarry, which may legitimately, if only rarely, warrant " 'a dramatic change of locale' " *(Daghir v Daghir, supra,* at 194, citing *Weiss v Weiss, supra,* at 177). "The search, therefore, is for a reasonable accommodation of the rights and needs of all concerned, with appropriate consideration given to the good faith of the parties in respecting each other's parental rights" *(Daghir v Daghir, supra,* at 195). The courts' approach to issues of this nature is on an ad hoc basis *(see, Blundell v Blundell,* 150 AD2d 321, 324).

Applying these principles to a specific set of facts, this court

has countenanced a move by a custodial parent of two children from Long Island to Londonderry, New Hampshire *(see, Blundell v Blundell, supra)*. The move was prompted by the mother's desire to be closer to her parents and her brother and by the prospect of full-time employment and diminished living expenses. Significantly, the mother had expressed a desire to promote continued visitation by the father and had proposed a rather liberal schedule which would provide visitation on alternative weekends, during school recesses and during the summer months. The mother even volunteered to drive the children to a midway point between New Hampshire and New York in order to facilitate the father's visitation. Of further significance was the fact that Londonderry, New Hampshire, is only approximately 30 to 40 miles distant from Logan Airport, from which point shuttle services to New York's LaGuardia Airport operate regularly. On those facts, this court determined that the proposed visitation schedule would insure the father regular and meaningful access to the children. Accordingly, upon a balancing of the equities, the mother was permitted to move to New Hampshire, subject to liberal visitation by the father *(see, Blundell v Blundell, supra)*.

In *Zaleski v Zaleski* (128 AD2d 865) this court sanctioned a relocation of the mother, with the parties' three children, from Long Island to Syracuse. While noting that the subject move was not to a distant jurisdiction, the court emphasized the fact that the mother, who had always been cooperative with respect to the father's visitation rights, had proposed a liberal visitation schedule. Although the relocation might have decreased the frequency of the father's visits, the proposed visitation schedule was deemed to afford the father regular and meaningful access to the children. Moreover, in *Zaleski,* as well as the instant case, the parties' separation agreement did not purport to restrict the geographical movements of the custodial parent.

Similarly, in *Martinez v Konczewski* (85 AD2d 717, *affd* 57 NY2d 809), this court sanctioned a relocation to Florida where the relocation was apparently undertaken in good faith based upon the legitimate professional and financial concerns of the plaintiff's new husband. As in the instant case, the relocation was not at variance with the terms of the parties' separation agreement, which did not purport to restrict the geographical movements of the custodial parent.

A number of other courts have considered the question of

whether a former spouse's remarriage constitutes an exceptional circumstance. " 'To be sure, exceptional circumstances permitting relocation generally have been found when the custodial parent seeks to accompany a new spouse to a new location and/or the noncustodial parent is less than an exemplary parent' " *(Reyes v Ball,* 162 AD2d 770, 771).

In *Reyes,* there was no serious dispute that defendant was a fit and loving father, notwithstanding his delinquency with respect to support payments. The court found that the mother's proposed relocation to Wyoming would promote her own well-being and provide important, familial surroundings *(Reyes v Ball, supra; see also, Matter of Aldrich v Aldrich,* 130 AD2d 917).

Similarly, in *Matter of Pecorello v Snodgrass* (142 AD2d 920), the court found exceptional circumstances warranting the mother's relocation with the parties' child from Utica to Winston-Salem, North Carolina. The custodial parent's new spouse had been involuntarily transferred to North Carolina due to his prior employer's merger with Piedmont Airlines. His position in the northeast was abolished in the merger and no comparable supervisory positions were available in this geographic region *(accord, Matter of Porter v Fryer,* 142 AD2d 770, where relocation to Norfolk, Virginia, was justified by the transfer of the new husband and every reasonable alternative to relocation was made, short of the termination of his military service).

Cases involving denial of permission for a custodial parent to relocate with the marital issue involved situations where the parties had stipulated that the plaintiff would not move a distance in excess of 50 miles from her present address without the defendant's prior written consent *(see, Coniglio v Coniglio,* 170 AD2d 477), or where there was no evidence that close family relationships warranted relocation to California *(see, Meier v Meier,* 156 AD2d 348, 351). Neither a desire for economic betterment, as opposed to economic necessity, nor the actual offer of a promotion and a salary increase has been found to constitute an exceptional circumstance sufficient to justify a move *(see, Matter of Bonfiglio v Bonfiglio,* 134 AD2d 426, 427-428; *Morgano v Morgano,* 119 AD2d 734, 736-737; *Kozak v Kozak,* 111 AD2d 842, 843-844).

The mere fact of the custodial parent's remarriage will not, without more, constitute an exceptional circumstance *(see,*

*Lo Bianco v Lo Bianco,* 131 AD2d 642 [move to Montreal, where new husband resided and conducted his business, was unwarranted where the child enjoyed a close relationship with both sets of grandparents and both parties' other relatives, all of whom resided in Nassau and Suffolk Counties]; *see also, Richardson v Howard,* 135 AD2d 1140 [no exceptional financial, educational, employment or health considerations existed which necessitated a move to Michigan, particularly where the mother and her fiancée indicated a willingness to return to New York after one year and demonstrated no employment ties to Michigan]; *Daghir v Daghir,* 82 AD2d 191, *affd* 56 NY2d 938, *supra* [where the proposed move to France was not required by any truly compelling factor inasmuch as the new spouse accepted the assignment merely to enrich his portfolio and stood to lose nothing by rejecting it; there was, furthermore, a question of good faith inasmuch as the job and relocation were known prior to the mother's remarriage and she attempted to conceal it from the appellant]).

What must not be lost sight of is the balancing test which courts must apply in endeavoring to resolve issues of this nature. A persuasive argument can be made that rigid adherence to the exceptional circumstances test impermissibly infringes upon the rights of custodial parents to marry, travel and, generally, to live their lives. This can be demonstrated by viewing the law currently applicable in New Jersey.

Prior to 1988, the New Jersey rule was that a custodial parent had to demonstrate the threshold showing of "real advantage", which was analogous to New York's requirement of a showing of exceptional circumstances. In 1988, the Supreme Court of New Jersey held, in *Holder v Polanski* (111 NJ 344, 544 A2d 852, 856), that the custodial parent need not establish that "real advantage" would emanate from the move. Rather, any sincere, good-faith reason will suffice. Once the court finds that the custodial parent wants to move for a good-faith reason, it should then consider whether the move would be inimical to the best interests of the children or adversely affect the visitation rights of the noncustodial parent. If the proposed relocation would require substantial changes in the existing visitation schedule, the court should then go on to examine the integrity of the parties' motives, the prospective advantages of the move, and the development of a reasonable visitation schedule. The focus should be always on whether the children stand to suffer from the move. In essence, the New Jersey rule is that, short of an adverse effect

on the noncustodial parent's visitation rights or other aspects of the children's best interests, the custodial parent should enjoy the same freedom of movement as the noncustodial parent. The rationale underlying the New Jersey rule is essentially predicated upon an equal protection argument. A stronger requirement arguably exposes the custodial parent to infringement of his or her rights, while the noncustodial parent is free of any comparable restraints. While the sincere, good-faith reason rule *(see, Holder v Polanski, supra)* is clearly not the governing standard in New York, the balancing process underlying that rule is, nevertheless, illustrative and useful in making our determination here.

Allowing the plaintiff and the parties' two children to relocate to London equitably balanced the competing interests in this case. It bears reiterating that, while the predominant concern is the children's best interests, resolution of disputes of this nature also "entails a careful balancing of both the rights and problems of the child and his parents" *(Kozak v Kozak,* 111 AD2d 842, 843, *supra).*

In view of this balancing test, there is no basis for a per se rule, i.e., that inasmuch as relocation involves separation from a noncustodial parent which is, of itself, not in the child's best interest, relocation should be denied as a matter of law. Although the court in both *Meier v Meier* (156 AD2d 348, *supra),* and *Daghir v Daghir* (82 AD2d 191, *affd* 56 NY2d 938, *supra),* in refusing to sanction relocation, focused upon the fact that the proposed move was not in the child's best interest because it entailed separation from the noncustodial parent, it is significant to note that, in both *Meier* and *Daghir* the court noted the absence of any compelling reason for the relocation. Notwithstanding the language of those cases, a per se rule would eliminate the exceptional circumstances test which has long been recognized in New York. It would, moreover, directly contravene a line of cases in which courts have determined a relocation to be in the best interests of the children concerned *(see, Reyes v Ball,* 162 AD2d 770, *supra; Blundell v Blundell,* 150 AD2d 321, *supra; Matter of Porter v Fryer,* 142 AD2d 770, *supra; Matter of Pecorello v Snodgrass,* 142 AD2d 920, *supra; Matter of Aldrich v Aldrich,* 130 AD2d 917, *supra; Matter of Zaleski v Zaleski,* 128 AD2d 865, *supra; Martinez v Konczewski,* 85 AD2d 717, *affd* 57 NY2d 809, *supra).* In the final analysis, a best interests determination must be made considering all relevant factors.

In making this determination in the instant case, it is

imperative to remember that the order appealed from was made after a lengthy hearing based on an extensive record. It is well settled that the decision of a hearing court, which has had the opportunity to evaluate the evidence first hand, is entitled to great deference and is not to be lightly disturbed *(see, Zaleski v Zaleski, supra,* at 866). That general tenet is particularly applicable where, as here, there has already been a well-developed hearing.

It is important to note, in the instant case, that there has never been any finding that either parent is unfit. The fitness of each parent is attested to by the fact that each has acted reasonably during the instant dispute and each has endeavored to accommodate the other's position.

Significantly, the relocation involved here is not merely a move for economic betterment. Rather, the new spouse's sole economic livelihood is London-based. No suggestion has been made that he could endeavor to find comparable employment in the United States, let alone in the northeast region. As aptly recognized by Justice Mangano in his dissent in *Daghir v Daghir (supra,* at 197), granting the defendant's motion to enjoin the relocation under such circumstances would effectively force the plaintiff to make the difficult choice between not accompanying her present husband in order to retain custody of her children by maintaining her former husband's regularly scheduled visitation rights, or relinquishing custody of the children in order to fulfill her present marital obligations.

Upon review of this record, we conclude that the relocation of the children to London to reside with their mother and stepfather will not destroy the relationship existing between them and their natural father. Although not the determining factor, the parties' separation agreement does not purport to restrict the geographical movements of the custodial parent. More significantly, the parties are demonstrably intent on setting up reasonable visitation schedules so that the noncustodial parent would continue to remain an important part of the children's lives. It bears noting that the parents have not had anything resembling joint custody prior to the move. In view of the significant distance between the mother's former residence in Lawrenceville, New Jersey, and the father's residence in Westchester County, the children are not unaccustomed to "long-distance" visitation. The record reveals that the parties previously arranged to meet in Manhattan to "exchange" the children for the weekend. While the distance

between Lawrenceville, New Jersey, and Westchester County is by no means the same as that between New York and London, it still indicates that the quality of the visitation is not likely to be substantially altered. Moreover, it is in the best interests of the children to continue to reside with their mother, who has been their primary caretaker since birth.

We conclude, from the record before us, that both parents recognize each other's roles in the lives of their children, as a result of which they will each strive to encourage and foster visitation. For these reasons, the trial court's equitable balancing of the competing interests involved here should not be disturbed.

BRACKEN, J. P. (dissenting). The Supreme Court's resolution of the present child custody dispute constitutes an improvident exercise of discretion, if not an error as a matter of law. The practical effect of the order under review would be to remove two children from their father, as well as from their extended family here in the United States, and to send them to London, England, where they would reside permanently in the household of their mother's second husband. Since there are no "exceptional circumstances" which warrant this radical disruption in the children's lives, I conclude that the order under review must be reversed.

David Hemphill, the defendant-appellant, and Lauren Hemphill, the plaintiff-respondent, were married in 1977, and became the parents of a daughter, Meredith, who was born in 1982, and a son, also named David, who was born in 1983. The parties were divorced pursuant to a judgment dated July 30, 1988, in which a separation agreement dated April 7, 1988, is incorporated but not merged.

Prior to their divorce, the parties had resided together with their children in Mount Kisco, New York. David Hemphill, Sr., was employed by the management of the "Progressive Farmer" magazine; Lauren Hemphill was a singer and performer, but was not employed.

Neither parent can be faulted in any way with respect to the care and concern which they have demonstrated for their two children. Before the separation and subsequent divorce, Mr. Hemphill participated in the upbringing of his children as actively as the circumstances of his employment permitted. He was often required to supervise the children by himself for the periods of time during which his former wife traveled to and vacationed in London.

After the parties separated, Mr. Hemphill continued to foster his close relationship with his children. He never missed weekend visitation scheduled under the parties' agreement. In each of the two years which followed the separation, Mr. Hemphill spent all or part of approximately 100 days with his children, although the children resided with their mother at a considerable distance, in Lawrenceville, New Jersey.

In April 1989 the plaintiff made known her intention to marry John Goldsmith, a British national who resides in London. The instant motion was brought shortly thereafter. In July 1989, during the pendency of the motion, the plaintiff married Mr. Goldsmith.

After a hearing, the Supreme Court denied the defendant's motion to enjoin his former wife from relocating the children to London, and to transfer legal custody of them to him. The court also provided for a visitation schedule which would allow the children to travel from England to visit Mr. Hemphill once a year during the summer (for six weeks) and four times a year during other school holidays. This appeal followed.

The applicable rule of law is that one parent may not frustrate the other parent's exercise of the natural human right to frequent visitation with the children, and that the custodial parent may not, therefore, remove the children to a geographical location so distant as to render the exercise of that basic human right by the noncustodial parent impracticable. While the vicissitudes of modern life often prompt a custodial parent to relocate for economic or personal reasons, the law requires that the interests which might justify such a relocation be balanced against the fundamental human right to frequent visitation possessed by the noncustodial parent. The latter right is considered so weighty that only in "exceptional" or "compelling" circumstances will a parent who insists on relocating be permitted to retain custody *(see, e.g., Daghir v Daghir,* 82 AD2d 191, *affd* 56 NY2d 938; *Coniglio v Coniglio,* 170 AD2d 477; *Reyes v Ball,* 162 AD2d 770; *Meier v Meier,* 156 AD2d 348; *Matter of Aadahl v Aadahl,* 148 AD2d 531; *Matter of Bonfiglio v Bonfiglio,* 134 AD2d 426; *Lo Bianco v Lo Bianco,* 131 AD2d 642; *Morgano v Morgano,* 119 AD2d 734; *Kozak v Kozak,* 111 AD2d 842; *Matter of Savino v Savino,* 110 AD2d 642).

In accordance with this rule, custody should generally be

awarded to the parent who is capable of remaining in proximity to the marital home, that is, the place where the children are more likely to have established contacts with extended family members, friends and acquaintances. This is a concern which is highlighted in the present case in that the children know no one in England (apart from their mother), whereas they have several relatives in the United States. Furthermore, the record does not contain evidence sufficient to guarantee that the children would make a smooth transition from American public schools to the English "public" (i.e., private) school to which they would be sent by their mother and stepfather, a school which would include religious instruction under the auspices of the Church of England.

I acknowledge that, in some cases, the best interests of the children may warrant recognition of an exception to this general rule. These cases are, however, the "exception" rather than the "rule", precisely because it is extremely rare that a child's best interests will be served by depriving him or her of contact with the "mature guiding hand and love of a second parent" *(Weiss v Weiss,* 52 NY2d 170, 175). The "exceptional circumstances" standard was devised by the courts in cases such as *Daghir v Daghir (supra)* in order to deter one parent from frustrating the children's right to frequent visitation with their other parent. The exceptional circumstances standard is thus primarily designed to protect the rights of the children by taking into account the benefits they derive from frequent contact with both their natural mother and their natural father, and by deterring any conduct on the part of *either* parent which would tend to deprive the children of this right.

The exceptional circumstances rule is, in other words, designed to *encourage* the children's regular access to *both* parents by *discouraging either* parent from moving away from the situs of the former marital home. In my view, this rule would lose a substantial amount of its deterrent effect if it were given less force in those cases in which the custodial parent has moved (or, as here, has made absolutely clear the intent to move) even before knowing the effect that such a move would have in the custody issue, than in those cases in which the custodial parent more prudently awaits a judicial determination on the custody issue before moving. Accordingly, in the present case, no weight should be given to the fact that because of her marriage to a British subject, the plaintiff has already rendered her translocation to England a

virtual inevitability. The court should not, in other words, accept the plaintiff's relocation to England and the disruption of the preexisting custody agreement which it necessarily entails, as a fait accompli, and should instead judge the merits of the custody issue as though the plaintiff's relocation were not a foregone conclusion. To approach the issue otherwise would be to encourage child custody litigants to change, rather than to preserve, the status quo ante during the pendency of a custody dispute, in the hope of influencing the court's decision.

Even if I were to consider the plaintiff's transatlantic relocation as an accomplished fact, that is, a circumstance which cannot now be changed and upon which the deterrent force represented by application of the "exceptional circumstances" standard can have no effect, I would nevertheless conclude, as a matter of fact, that the best interests of the children require that they remain in the United States with their father. As noted above, both parties to this proceeding are good parents and neither can be said to be inherently superior to the other.

Both parties are fully capable of providing for the children's physical well-being. If it can be said that the plaintiff-respondent, due to her second husband's wealth, will not be required to work, and will thus be able to spend more time with the children, then it can just as well be said that it is the plaintiff-respondent who will be more able to set aside the time (and the resources) needed to engage in the frequent transatlantic travel which will be necessary if regular visitation is to occur.

In sum, there is no basis in the present record upon which to conclude that one of the parties—either the mother or the father—is intrinsically more "fit" as a parent. There is similarly no basis upon which to conclude that the children would be better off residing with one of the parties, rather than with the other. Given the equivalence which results when the "best interest of the children" test is applied, I conclude that the case must be decided with reference to the rule which disfavors the relocating parent, since it is that parent who, even if for the best of reasons, must ultimately be considered responsible for the breakdown of what had been a fair and equitable custody arrangement.

The order under review should, therefore, be reversed, on the law and as a matter of discretion, the defendant's motion should be granted to the extent that the plaintiff should be enjoined from removing the children to England, and to the

further extent that legal custody of the children should be transferred to him, and the matter should be remitted to the Supreme Court, Westchester County, for further proceedings to determine the time and manner of the plaintiff's visitation with the children.

KOOPER and RITTER, JJ., concur with KUNZEMAN, J.; BRACKEN, J. P., and BALLETTA, J., dissent in an opinion by BRACKEN, J. P.

Ordered that the order is affirmed insofar as appealed from, with costs.