OPINION OF THE COURT
Fuchsberg, J.
In this matrimonial action, divorced parents, each devoted to the welfare of their now 11-year-old son, are enmeshed in a dispute over the desire of the mother, custodian of the child, to take the boy with her to Las Vegas, Nevada, where she intends to set up residence as part of a plan to make “a new life” for herself.
Judicial intervention was precipitated when the father, perceiving that the practical effect of such action would be to undermine his visitation rights, sought to enjoin his former wife from removing the child from this State. After a testimonial hearing, Supreme Court, Westchester County, denied the father’s application. The Appellate Division, reversing, granted the injunctive relief he sought. The mother now appeals.
Entered in 1975, when the child was six, the judgment of divorce, which did not-suggest that either party was an unfit parent, provided for the incorporation, but not the merger, of a separation agreement the parties had theretofore executed. The judgment provided, as had the agreement, that the custody of the child was to be in the mother. Pertinent to custody and visitation, it was express in reciting that the Supreme Court, concurrently with the Family Court, retained jurisdiction “for the purposes of specifically enforcing such provision of the agreement as are capable of specific enforcement or, to the extent permitted by law of making such further decree * * * as it finds appropriate under the circumstances existing at the time application for that purpose is made” (see Domestic Relations Law, § 240, subd 1; McKinney’s Cons Laws of NY, Ann, 1980 NY Court Rules, p 417, § 699.9, J 13).
*173 Since the decree did not spell out the details of the paternal visitation rights in haec verba, we must turn to the surviving separation agreement. Fairly generous in scope, these visits included one weekday afternoon each week, two-day visits every other weekend, alternating Easter and Christmas holiday seasons and two continuous weeks during the summer. It is not disputed that the father availed himself fully and regularly of these opportunities for communion with his son. Nor does there appear to be any question but that the relationship so nurtured was strong and positive. Indeed, the factual findings make clear that, during the more than five years that have gone by since the divorce, the parties, to their mutual credit, each fully respecting the other’s role as custodian or noncustodian, have been concerned and dedicated parents.
It is also relevant to this case that, according to the agreement, “the Husband and the Wife shall continue to live separate and apart from each other and [that] each may reside from time to time at such place or places of residence or abode as he or she shall respectively choose”. Upon this clause the mother in part premises her contention that she is free to move to Las Vegas with the child.
At nisi prius, the mother further explained that, as a single person residing with her child in the former marital suburban residence in Westchester,[1] she found herself confined by the social limitations of a community of married persons and pressed by the impact of inflation on a relatively tight budget. As she saw it, relocation to Las Vegas might solve her problems. In the less structured environment of that city, where she would seek suitable employment, preferably by putting an interest in singing to vocational advantage after a lapse of some 15 years, she hoped to find fulfillment. While she recognized that the barrier of physical distance thus interposed between father and son would severely curtail their visits, she nevertheless rationalized the end result as one which, overall, served the child’s best interests. In her own words, “since I am in charge of the day-to-day upbringing of my son, if I am *174 happy and well-adjusted with my surroundings, chances are that my son will be as well”.
The Trial Judge, in making what he acknowledged to be a difficult decison — all the more so because, in an in camera interview, the boy had stated a preference for remaining in New York so that he could be near his father — concluded, on balance, that the mother was entitled “to improve her own life, so long as that move does not injure the child”. In reaching its contrary view, the Appellate Division held that the consequent interference with visitation rights was not warranted by the circumstances presented. For the reasons which follow, we uphold its determination.
Prefatorily, we turn to the mother’s reliance on the residency clause, the unqualified language of which, if read in isolation, would seemingly leave her free to reside wherever she chooses. However, the first operative provision in a fairly extensive separation agreement, it smacks more of the kind of “boilerplate” commonly employed by many draftsmen primarily to memorialize the fact that the parties are to respect their separated state (see, e.g., 1 Lindey, Separation Agreements and Ante-Nuptial Agreements, Form 8.02, at pp 8-1 to 8-2). Significantly, it makes no reference to the child. Most important, it does not take into account the extensive and explicit provisions for the father’s meaningful access to his son, covenants which would be rendered illusory were the residence clause to be read as if it stood alone. For the general principle is that an agreement, where possible, should be read as a whole so as to give each section meaning. Even so, as the Trial Judge, who correctly refused to posit his decision on either the residence clause or the visitation provisions alone, correctly noted, such agreements are not immutable.
It is also well to consider the attitudes of the law on parental visitation. Sometimes referred to as a “natural” parental right (Matter of Denberg v Denberg, 34 Misc 2d 980, 986 [J. Irwin Shapiro, J.]; Fournie, Post-Divorce Visitation: A Study in the Deprivation of Rights, 27 De Paul L Rev 113, 117), this appellation is too narrow. It ignores the primacy of the child’s welfare (see Matter of Ebert v Ebert 38 NY2d 700, 702; Domestic Relations Law, *175 § 70). Where the physical and emotional well-being of a child is involved, it is, at best, anomalous that its protection should be dependent on the vindication of the “rights” of the parents. Visitation is a joint right of the noncustodial parent and of the child (cf. Henszey, Visitation by a Noncustodial Parent: What is the “Best Interest” Doctrine?, 15 Journal of Family Law 213, 214-215). This view does not lose sight of the fact that, while legal custody may be in one or both of the parents, the fact that it is placed in one does not necessarily terminate the role of the other as a psychological guardian and preceptor (see Gardner, Psychotherapy with Children of Divorce, p 381).
How valuable the mature guiding hand and love of a second parent may be to a child is taught by life itself. This is surely so when the parent-child relationship is carefully nurtured by regular, frequent and welcomed visitation as here (see Fournie, Post-Divorce Visitation: A Study in the Deprivation of Rights, 27 tie Paul L Rev 113, 114, and cases cited thereat). Therefore, in initially prescribing or approving custodial arrangements, absent exceptional circumstances, such as those in which it would be inimical to the welfare of the child or where a parent in some manner has forfeited his or her right to such access (Strahl v Strahl, 66 AD2d 571, affd 49 NY2d 1036), appropriate provision for visitation or other access by the noncustodial parent follows almost as a matter of course.
The State’s special concern with the interrelated, although of course not identical, matters of custody and visitation is not newborn. While contemporary courts most often will defer to the terms negotiated by the parents (Matter of Ebert v Ebert, 38 NY2d 700, 703, supra; Aberbach v Aberbach, 33 NY2d 592; Pilpel & Zavin, Separation Agreements: Their Function and Future, 18 L & Contemp Prob 33, 34-35, n 2), for a long time such agreements were not enforceable (2 Foster — Freed, Law and the Family, § 29.21, p 535). Today, however, when, as in this case, courts are called upon to interpret or apply an agreement on this subject, in this State they must not hestiate to resolve the issue (Domestic Relations Law, § 240).
These considerations in mind, we note that at the hearing *176 it in effect was agreed that the mother’s plans were made in good faith. In particular, there is no suggestion that she was motivated by a desire to put the child out of the reach of the father or to jeopardize their relationship (see Matter of Denberg v Denberg, 34 Misc 2d 980, supra; Matter of Whittemore v Whittemore, 202 Misc 175). On the positive side, as the trial court found, she pursued a felt obligation to check the availability in Las Vegas of a suitable home, school and place of religious instruction for her child.[2] And, right from the beginning, she has volunteered a willingness to agree that the father’s anticipated sparser paternal visits be longer ones.
However, such a trade off, whether voluntarily offered or judicially imposed, does not necessarily meet the needs of the child or father. Gainsaying the expense of travel across the country, given the unavailability of batches of time for making longer trips and the large gaps that will intervene between meetings of father and son, it cannot be said that the paternal input, if not the quality of the filial relationship itself, will not suffer. For instance, nothing like the 150 to 200 days per year on which, as the record shows, they have been seeing something of one another is envision-able. This could be especially troublesome to a boy who would be wrenched away from a father to whom he has expressed great attachment. While his wishes need not have been determinative, they were not without moment.
Children are not exempt from the dislocation that almost inevitably is imposed on both the young and the adult members of a family affected by divorce. But, in pursuit of society’s desire to shield a youngster from ensuing disruptions, the law does not insist that the parents make every possible sacrifice, no matter how disproportionate it may be to the benefit it would bestow on the child. The parents too are entitled to consideration. Always remembering the formative aspects of childhood, the quest, if possible, *177 is for a reasonable accommodation of the rights and problems of both.
But here it is worth noting that the injunction is not calling upon the mother to forego a unique, or even firm, vocational offer; as the Appellate Division remarked, however well intentioned, her search is for no more than an “opportunity”. Nor is the proposed migration to the “Sun Belt” fueled by any exceptional health or educational needs, of a mother or of child (see, e.g., Nash v Nash, 236 App Div 89, affd without opn 261 NY 579; see Harris v Harris, 57 Misc 2d 672). And, as we know, this is not a case where the obligations undertaken by a divorced parent who marries anew require a dramatic change of locale.
We therefore find no reason to conclude that the Appellate Division abused its discretion in making the order it did.[3] Accordingly, we should affirm.

. The wife received the house as part of the marital settlement and has continued to reside in it.

. Since the overriding issue that controls the outcome of this case has not involved any dispute between the parties as to the role of a custodial parent in the determination of a child’s secular and religious training as such, we have no occasion to accept the concurrer’s invitation to explore that subject at this time.

. Because the order of the Appellate Division did not incorporate any provision based on so much of its opinion as dealt with the relationship of support payments to adherence to a residential removal proscription, we have no occasion to deal with that question (see Strahl v Strahl, 49 NY2d 1036, 1038, supra). As to counsel fees, in light of the services which have intervened since Special Term made its award, any further application would be for the courts below.