Matter of Kelly C. v Jason C. (2006 NY Slip Op 51820(U))

[*1]

Matter of Kelly C. v Jason C.

2006 NY Slip Op 51820(U) [13 Misc 3d 1214(A)]

Decided on July 27, 2006

Family Court, Monroe County

Sciolino, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 27, 2006

Family Court, Monroe County
In the Matter of a Proceeding under Article 6 of the Family Court Act, Kelly C., Petitioner
 against
Jason C., Respondent
V-13292-05/05A

APPEARANCES:Edward Nowack, Esq.
Monroe County Public Defender
Attorney for Petitioner
Tamara Guglin, Esq., of Counsel
William McGinn, Esq.
Attorney for Respondent
Gilberto Perez, Esq.
Law Guardian

Anthony J. Sciolino, J.
Petitioner (hereinafter "Mother") and Respondent (hereinafter "Father") are the parents of one child, Anthony, born out of wedlock on May 2, 2003. Parents married 14 months later and continued residing together in Monroe County until Mother left the marital residence with Anthony on September 23, 2005 to go live at her parents' home in Wayne County. Three days later, on September 26, 2005, Mother filed a petition for custody of Anthony in Wayne County Family Court. Father answered and cross-petitioned for sole custody requesting, among other things, that the case be transferred to Monroe County Family Court, the appropriate venue, which was granted by Hon. Dennis Keogh on October 14, 2005.
On October 17, 2005, before the transferred case could be calendared here, Father filed a petition in this Court by Order to Show Cause seeking sole custody of Anthony and temporary physical residence of him during pendency of the proceeding. Another judge of this Court, Hon. John J. Rivoli, granted Father's request for temporary physical [*2]residence. Subsequently Judge Rivoli recused himself and the case was assigned to this judge. Also on October 17, 2005, in what apparently was a "race to the courthouse," Mother filed a petition seeking custody of Anthony by Order to Show Cause in which she alleged that Father was not allowing her contact with the child and that Father had stated to her "... the only way I will get Anthony back is to move back in with him."
After a six day fact finding proceeding and after due deliberation, the Court decides as follows:
FINDINGS OF FACT
Anthony, as noted above, was born out of wedlock on May 2, 2003. Mother and Father married on July 7, 2004. It was Mother's second marriage and Father's first. Mother was Anthony's primary caretaker, but Father shared in childcare as well. Backup child care was provided by maternal and paternal relatives. At times both parents were employed outside the home, but each also had periods of unemployment. Both sets of grandparents helped the couple financially.
Mother testified that a month or two after the wedding, Father began treating her differently. For example, he criticized how she performed household duties. His only complaint about how she cared for Anthony, however, was that the child had an occasional diaper rash.
Their relationship deteriorated and the downward spiral intensified when in July 2004, Father began meeting with others to plan the startup of a new restaurant. He asked Mother to quit her job at Heritage Christian Home so that she could devote more time to Anthony and he could devote the time necessary for the restaurant venture.
In September 2004, Mother quit her job at Heritage Christian Home and began taking academic courses at Monroe Community College. In May 2005, the restaurant opened and the situation deteriorated even further as Father became more distracted, working long hours, seven days a week at the restaurant. Household bills were not being paid, Mother had no access to any financial resources of her own, and more of the child care responsibilities fell to her alone. Financial concerns, including the possibility of eviction from their home strained their relationship even more and, eventually, they filed for bankruptcy.
During that stressful time, Father voiced no complaints about Mother's care of Anthony, but continued to voice complaints about her housekeeping. In addition, he began to complain about her appearance, criticizing her weight and mode of dress, both privately and in public. He denigrated Mother, for example, by referring to her as a "hoochie" and a "ho," at times in Anthony's presence. Mother testified that Father's "put downs" of her escalated to the point where her friends stopped coming over because they did not like how he was treating her. When Mother protested to him, he responded: "If you don't like it, there's the door."
Mother began to exhibit symptoms of depression for which she sought professional help. Besides consulting with a physician who prescribed an anti-depressant medication, Mother also sought counseling at Monroe Community College where she was attending classes. By September 2005, only 14 months into the marriage, the couple's relationship [*3]had deteriorated to the point where Mother felt compelled to leave the marital residence.
As previously noted, Mother left the marital residence with Anthony on September 23, 2005. Pursuant to their oral agreement, Father was to pick up Anthony from the maternal grandparents' residence in Sodus on September 25th , which he did. He was to return him on October 2nd , which he did not. Father refused to return Anthony to Mother until November 17th , two days after their initial appearance on this case when an Order of visitation was granted.
During those preceding six weeks, Father insisted that Mother visit alone at the marital residence under either his or his family members' supervision. Moreover, Father behaved egregiously toward Mother by saying such things as, "Now, you can go back to being a whore, a tramp, a party girl," "I'll make your life a living hell," and "I'll make sure Anthony hates you when he's older." In addition to seeking judicial intervention, first in Wayne and then Monroe County Family Courts, Mother also filed complaints regarding Father's behavior with the New York State Police, the Wayne County Sheriff's Office and the Ogden Police Department.
The maternal grandmother testified that when the couple lived together, although Father complained to her about Mother's housekeeping, he never complained about Mother's care of Anthony. She also testified that after the restaurant opened Mother telephoned her several times "crying her eyes out." She was unhappy because Father was "never at home," that they were having money problems, and that he had said she (Mother) "dressed like a ho.'"
The maternal grandfather testified that shortly after Mother separated from Father, he overheard Father's phone conversation with Mother in which Father said in a loud voice, among other things: "You will never see Anthony again," and "We're gonna fix this." On another occasion the maternal grandfather overheard Father's phone conversation wherein he referred to Mother as a "tramp" and "a piece of garbage."
Mother currently resides in her parents' home in Sodus, NY with her parents and 13 year old sister. The home has four bedrooms and is located on 1.8 acres of land on a dirt road that has little traffic. Mother hopes to build a home for herself and Anthony at that location sometime in the future.
No longer in treatment for depression or taking medication, she now works two jobs and hopes to resume taking college course soon. When she is away from the home, her parents or other appropriate adults provide child care for Anthony. Mother is a good parent who has a loving relationship with Anthony.
Father also is a good parent who has a loving relationship with Anthony. He is employed, lives alone in the former marital residence and has a large extended family which assists him with child care. His family enjoys spending time together, including gatherings at the paternal grandparents' summer cottage on a nearby lake. He does, however, engage in controlling and other negative behaviors toward Mother (as noted above) which the Court finds troubling. Another more recent example is Father unilaterally enrolling Anthony in pre-school beginning in September without consulting Mother. His continued assertion that Mother is an "unfit" or irresponsible parent is without merit. Mother, by contrast, says nothing negative about Father's parenting.
[*4]CONCLUSIONS OF LAW
In determining custody between parents the Court must look at the totality of circumstances in order to determine what is in the child's best interest. Friederwitzer v. Friederwitzer, 55 NY2d 89, 447 NYS2d 893, 432 NE2d 765 (1982).
Determining that which is in the child's best interest requires that consideration be given to many factors, namely the care and affection shown; the stability of the respective parents; the atmosphere of the homes; the ability and availability of the parents; the morality of the parents; the prospective educational probabilities; the possible effect of custodial change on the children; the financial standing of the parents and the parents' past performance are but a few of the areas requiring exploration. Saunders v. Saunders, 60 AD2d 701, 400 NYS2d 588 (3rd Dep't. 1977).
In this case both parents love their son and have supportive families to assist them. Both are involved with and attentive to Anthony's emotional and physical needs, although Father attempted unsuccessfully to call into question Mother's parenting ability. The Court is concerned, however, that Father's negative attitude and conduct toward Mother, if unabated, will adversely affect Anthony, if it has not done so already.
Given the stressful nature of their relationship, both parents appear to be relatively stable. In a two-year time span they had a baby, married and established a home, had periods of unemployment, he attempted to start a new business requiring a great deal of time and effort, and they experienced financial difficulties which led to bankruptcy. In addition, Mother's stressors included dealing with a second troubled marriage and Father's insensitive behaviors toward her. It is not surprising that she experienced depression which, according to current statistics, affects 1 out of every 10 adults. To Mother's credit, she dealt appropriately with her illness by seeking professional help and taking prescribed medication. Father, on the other hand, was more a part of her problem than a solution.
Since leaving the marital residence Mother and Anthony have resided with her parents and sister in a rural setting and her stress level has been reduced. Father remains at the marital home in Spencerport. Both homes are appropriate for raising a child, although Father attempted unsuccessfully to portray Mother's home as less than appropriate.
As to ability and availability of each parent, both are equally capable and available. Both have arrangements, either with family members or other adults to care for Anthony when they are unavailable to do so. In spite of each parent's attempt to expose the parent's perceived moral weaknesses, none of the evidence leads this Court to conclude that one parent is morally superior to the other for purposes of determining custody. In addition, both are equally capable of providing for Anthony's educational needs and neither parent's financial situation is determinative.
Each parent is requesting sole custody and the Court finds, based upon the entire record, that they do not have the type of cooperative and amicable relationship necessary for joint-custody to be successful. Braiman v. Braiman, 44 NY2d 584. Therefore, with all the aforementioned factors for deciding custody being more or less equal, the determinative factor in this case is which parent will foster a healthy relationship between [*5]Anthony and the non-custodial parent. Weiss v. Weiss, 52 NY2d 170, 418 NE2d 377, 436 NYS2d 862.
"[O]ne of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the other parent," (Raybin v. Raybin, 205 AD2d 918, 921), and the willingness of a parent to assure such meaningful contact between the children and the other parent is a factor to be considered in making a custody determination. O'Connor v. O'Connor, 146 AD2d 909,910, 536 NYS2d 903, NYAD (1989); Lohmiller v. Lohmiller, 140 AD2d 497,498.
Under Saunders, supra , the Court should consider the parents' past performance. Mother's behavior since leaving Father has demonstrated a willingness to encourage and foster Father's relationship with Anthony despite challenging circumstances. By contrast, Father's behavior has or will have the opposite effect on the mother-son relationship. He is apparently clueless that his attitude toward, and treatment of, Mother both before and after their separation will adversely impact their son's emotional well-being. And he is likewise apparently clueless that his attitude and behavior since their separation are not likely to result in reconciliation of their marriage, which has been his stated objective.
Custody should be awarded to the parent who will insure a meaningful relationship with the other parent. Erck v. Erck, 147 AD2d 921 (4th Dept. 1989). In this case that parent is clearly Mother. She has done nothing to interfere with Father's relationship with his son or with Father's desire to raise Anthony in the Roman Catholic faith tradition. Moreover, she has encouraged Anthony's relationship with his paternal grandparents, although they have seemingly condoned some of Father's negative conduct.
Father's unilateral enrollment of Anthony in pre-school in Spencerport, without consulting Mother and before this matter was decided in Court, is another factor that argues against Father being awarded sole custody.
CONCLUSION
This Court finds that given the factors enumerated above, sole custody should be granted to Mother with liberal periods of physical residence to Father. In order to foster a healthier relationship between the parties for Anthony's and their own benefit, Father shall attend the A.C.T. for the Children program. This Court strongly encourages him to engage in individual counseling to address his negative attitude and behavior toward Mother.THEREFORE, it is
ORDERED,that Mother shall have sole custody with primary physical residence
of Anthony; and it is further
ORDERED, that Father shall have periods of residency three out of every four
weekends from Friday at 5:00 p.m. until Monday at 7:00 p.m. until Anthony enters
elementary school. At that time Father's weekend residency will end on Sunday at 7:00 p.m.; and it is further
ORDERED, that should Mother have to work the majority of her scheduled
weekend with Anthony, that Father then has the right to have the child reside with him for [*6]that weekend; and it is further
ORDERED, that Mother may interfere with Father's weekend residency from time to time so that Anthony may attend special occasions or events; and it is further
ORDERED, that Father shall have a three (3) hour period of residency on an agreed upon evening during the week following Mother's weekend with Anthony; and it is further
ORDERED,that Mother, after making a good faith effort to discuss issues with
Father, will have the final say in all major decisions regarding the child; and it is further
ORDERED, that during Father's periods of residency he will maintain Anthony's school activities and social obligations and will provide the necessary transportation to and from those activities; and it is further
ORDERED, that holidays (which supercede regular periods of residency), school recesses and birthdays will be as follows;
— Anthony will spend Mother's Day and Mother's birthday with Mother and
Father's Day and Father's birthday with Father.
— The parents will alternate Anthony's birthday and major holidays on odd and even years. In even years Mother will have Anthony on Thanksgiving, Christmas evening until 10:00 a.m. on Christmas morning, New Year's Day, Memorial Day and Labor Day. Father will have Anthony on the Friday after Thanksgiving, Christmas Day from 10:00 a.m. through the following evening, Anthony's birthday, Easter, and July 4th. In odd numbered years the schedule is reversed.
— Each parent shall have two non-consecutive weeks of uninterrupted
residency with Anthony between Memorial Day and Labor Day. The parents shall mutually agree on which two weeks each will have no later than April 15th of that year; and it is further
ORDERED, that Father shall have additional periods of residency, especially during school breaks, vacations and around major holidays, as can be mutually agreed upon between the parties; and it is further
ORDERED, that the parents will share equally in transporting Anthony back and forth for visits; and it is further
ORDERED, that each parent shall have reasonable telephone access to the child while the child is in the other parent's care, and the child shall be allowed to contact the other parent as the child wishes; and it is further
ORDERED, that neither parent shall make derogatory remarks about the other parent in Anthony's presence or allow any third party to do so; and it is further
ORDERED, that Father complete the A.C.T. for the Children program within the
next six (6) months.
Mother's attorney shall submit a written Order which reflects this decision.
Signed this_______day of July, 2006, at Rochester, New York.
______________________
ANTHONY J. SCIOLINO
Family Court Judge

[*7]
NOTICE:YOUR WILLFUL FAILURE TO OBEY THIS ORDER
MAY, AFTER COURT HEARING, RESULT IN YOUR
COMMITMENT TO JAIL FOR A TERM NOT TO
EXCEED SIX MONTHS, FOR CONTEMPT OF COURT.