Matter of Timothy J. v Gertrude W. (2007 NY Slip Op 52094(U))

[*1]

Matter of Timothy J. v Gertrude W.

2007 NY Slip Op 52094(U) [17 Misc 3d 1121(A)]

Decided on October 5, 2007

Family Court, Kings County

Hepner, J.

Published by New York State Law Reporting Bureau
pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on October 5, 2007

Family Court, Kings County
In the Matter of a
Proceeding for Visitation with Isaiah J. pursuant to Article VI of the Family Court Act, Timothy
J., Petitioner-Father,
against
Gertrude W., Respondent-Guardian
V-XX/07

APPEARANCES:
Cheryl Charles-Duval, Esq., for the Petitioner
44 Court Street, Suite 909
Brooklyn, New York 11201
Sandra L. Schpoont, Esq., for the Respondent
50 Broadway, Suite 1000
New York, New York 10004
Fredericka Bashir, Esq., for the Child
The Children's Law Center
44 Court Street, 11th Floor
Brooklyn, New York 11201

Paula J. Hepner, J.
On June 5, 2006 Timothy J. filed a petition for visitation with ISAIAH J. (born 6/6/1996).
The Petitioner was adjudicated the legal father of this child on February 22, 2007 and an order of
filiation was entered under Docket P-17654/06. The Respondent has been this child's legal
guardian since 1999 when she obtained an order of custody following an adjudication of neglect
[*2]by the child's mother.[FN1] Trial on these issues began on April 24, 2007
and was continued on June 19 and 27, 2007. The Petitioner testified in his own behalf and called
his sister, Jacqueline H., and Mary F., a maternal aunt, as witnesses. The Respondent testified in
her own behalf and called her son, Ian A., as her witness. None of the parties or the Law
Guardian made an application for a forensic evaluation and no documentary evidence was
introduced by either party. The Law Guardian requested the Court interview her client but did not
present a psychologist or social worker in support of her client's position. On July 25, 2007 the
Court conducted an in camera interview with ISAIAH and his attorney. Counsel
delivered oral summations on August 2, 2007 and decision was reserved in order to give the
Court an opportunity to review the testimonial and documentary evidence in the record and to
consider the points and authorities cited by counsel in their summations.
FINDINGS OF FACT
The Court, having
had the unique opportunity to hear the testimony of the witnesses, observe their demeanor, and to
assess their veracity, now makes the following findings of fact based on the material, relevant,
credible and competent evidence in the record.
The Petitioner maintained a relationship with Sharon F. from 1994-1997. The Petitioner
resided with Sharon F. after ISAIAH was born on June 6, 1996 for approximately three months
until she moved out and went to a women's shelter in Manhattan. Sharon F. left the shelter,
according to the unrebutted testimony of the Petitioner, and then went to a shelter on Tompkins
and Throop Avenues in Brooklyn. In 1997 Sharon F. needed someone to care for ISAIAH while
she was at work so her aunt, Mary F., who had been caring for Sharon's four-year-old daughter
Destiny, introduced her to Gertrude W.. Gertrude W. lives in the same building as Mary F. and
was babysitting Destiny while Mary F. was at work. Gertrude W. began to babysit ISAIAH when
he was nine or ten months old between the hours of 8 a.m. and 6 p.m.
After two or three weeks of bringing ISAIAH to Gertrude W.'s house in the morning and
picking him up in the evening, Sharon F. stopped coming and stopped giving her money, milk
and pampers. Gertrude W. alerted Mary F. who offered to get in touch with her niece. After a few
weeks, Sharon F. surfaced for another month and then disappeared again. Gertrude W. returned
ISAIAH to Mary F. who kept him for two weeks or so and then notified the Administration for
Children's Services that she was unable to care for him. ISAIAH was placed in foster care and
then eventually returned to Gertrude W. with a final order of custody dated August 30, 1999.
Since Gertrude W. obtained custody of ISAIAH, Sharon F. has called him and visited him very
infrequently.
When ISAIAH was seven years old he asked Gertrude W., whom he refers to as his
"mommy," if she was his real mother. Gertrude W. told him Sharon F. was his real mommy and
that she was not. Gertrude W. testified credibly that ISAIAH never asked her who his real father
is, although he refers to her son, Ian A., as his daddy. Gertrude W. also testified credibly that she
never knew who ISAIAH's father was, where he could be located or how he could be contacted.
She testified she once asked Sharon F. about ISAIAH's father who said, "Leave that story alone."
Although she initially testified she did not know about the Petitioner until she was served with a
[*3]summons to come to court, Gertrude W.'s memory was
refreshed on cross-examination, when she was asked if she remember being contacted by a
caseworker in December 2005 who informed her the Petitioner would like to see ISAIAH. In
December 2006 Gertrude W. was contacted by Ms. Huggins, a caseworker from ACS, to discuss
the Petitioner's desire to have contact with ISAIAH. Gertrude W. testified credibly that Ms.
Huggins called and visited her home, and that she asked Ms. Huggins how and where they would
meet. Gertrude W. testified credibly that Ms. Huggins said she could assist in arranging visitation
and that she never heard from her again.
In 1996 when the Petitioner broke up with Sharon F., he was thirty-five years old receiving
disability income, addicted to drugs and living "more or less like a street person." He was
incarcerated from September 1998 to January 1999. Upon his release, the Petitioner returned to
"living the street life...using and selling drugs" and was incarcerated again from January 2000 to
December 2005. When he went to jail in 1998, the Petitioner believed Margie Flowers, Sharon's
mother, took ISAIAH to North Carolina to live with her and the eight other children of Sharon F.
she was raising. Between 2000 and 2005, the Petitioner did not try to get in touch with ISAIAH
because he believed the child was with his maternal grandmother and he testified he was "alright
with that." The only inquiry the Petitioner made regarding ISAIAH was to contact his sister,
Jacqueline H.
Jackie H. testified she knew Sharon F. as the mother of her brother's children [FN2] and as his girlfriend. She claimed
to have learned from Sharon F., around the time ISAIAH was nine months old, that he was living
in North Carolina with her mother. While going to work three or four years ago, Jackie H. ran
into Sharon F. in the street. They spoke and she asked Sharon F. to have her mother mail a photo
of ISAIAH to her. Jackie H. and Sharon F. exchanged telephone numbers and they kept in
contact for about two months. After that, Jackie H. got in touch with Mary F. and learned
ISAIAH was living in Brooklyn in her building. Jackie H. did not make any efforts to see
ISAIAH beyond asking Mary F., on one occasion, if she could bring him to her house for a visit.
The Petitioner learned from his sister Jackie H. that ISAIAH was living in Brooklyn in 2003
or 2004 but never attempted to contact the child by writing letters, sending cards to him in care of
Mary F. or by telephoning her. Upon his release in December 2005, the Petitioner made no
attempt to contact the child or Mary F. until March 2006 when he maintains he tried
unsuccessfully to see ISAIAH through Mary F.. Between May and June 2006, the Petitioner
contacted ACS to try and see ISAIAH, also without success. Thereafter the Petitioner filed his
petition for visitation in court.
During his incarceration, the Petitioner "found God, became a Christian and gave [his] life
over to Christ." He testified he is a minister "ordained by God not man" and serves the El Bethel
Assembly of God in Staten Island where he lives with his eighty-two year old wife. The
Petitioner maintained he is clean and sober for seven years and has attended Camelot, an
outpatient drug program, for thirteen-fourteen months where he is randomly tested for drugs and
[*4]all results have been negative. No documentary evidence was
submitted in support of this declaration. He testified he is presently unemployed and receiving
disability income because he needs "a total hip replacement." He testified he was only seeking
visitation, not custody, but in summations his counsel seemed to contradict this when she
accused Gertrude W. of making no permanent arrangements to "legalize or secure ISAIAH's
position" should she become ill, infirm or die and that he would be the only person this child
would have.
CONCLUSIONS OF LAW
Under New York
law,"visitation is a joint right of the noncustodial parent and of the child" (Weiss v
Weiss, 52 NY2d 170, 175 [1981]), and "it is generally presumed to be in a child's best
interest to have visitation with his or her noncustodial parent" (Thomas v Thomas, 277
AD2d 935 [4th Dept 2000]). In Weiss, trial courts were directed to make appropriate
provision for visitation or other access by the noncustodial parent when "initially prescribing or
approving custodial arrangements absent exceptional circumstances, such as those in which it
would be inimical to the welfare of the child or where a parent in some manner has forfeited his
or her right to such access." As a general rule, in the absence of exceptional circumstances,
"some form of visitation by the noncustodial parent is always appropriate" (Zafran v Zafran, 28 AD3d 752 [2d
Dept 2006]). Denial of visitation to a natural parent is "a drastic remedy" that should be imposed
only where there are "compelling reasons and substantial evidence that visitation is
detrimental to the child's welfare" (Rodriguez v Medina, 277 AD2d 144-145 [1st Dept
2000] citing Matter of Farrugia Children, 106 AD2d 293 [1st Dept 1984]; (Mackey v
Mackey, 265 AD2d 329 [2d Dept 1999]).[FN3] When determining custody and visitation the
most important factor is the best interests of the child and courts must look at the totality of the
circumstances (Mauter v Mauter, 309 AD2d 737 [2d Dept 2003]). There must be a sound
and substantial basis in the record demonstrating that a parent's visitation is detrimental to the
child's welfare and contrary to the child's best interests (Hameed v Alatawaneh, 19 AD3d 1135-1136 [4th Dept 2005];
Valenza v Valenza, 143 AD2d 860, 862 [2d Dept 1988]).
Noncustodial parents are "entitled to meaningful visitation"(Kachelhofer v Wasiak, 10 AD3d
366 (2d Dept 2004) citing Vanderhoff v Vanderhoff, 207 AD2d 494 [2d Dept
1994]). There is case law directing trial courts, when "determining whether a parent's
privilege to associate with the children... should be either diminished or discontinued...not [to]
penalize the parent because he or she has not taken full advantage of visitation rights previously
granted. The test is not perfection but, rather, whether, under all the facts adduced, such parent
has demonstrated a sincere desire to be in the company of the children and has had a close,
continuous and meaningful association with them over a significant period of time"(Strahl v
Strahl, 66 AD2d 571, 577 [2d Dept 1979], affd 49 NY2d 1036 [1980]). However, in
spite of this [*5]strong presumption that visitation is in the best
interests of the child, there are appellate decisions finding "a denial of an application for
visitation is proper where evidence demonstrates that visitation would not be in the child's best
interest" (Beverly v Bredice, 299 AD2d 747, 748 [3rd Dept 2002]; Iadicicco v
Iadicicco, 270 AD2d 721 [3rd Dept 2000]). The vast body of caselaw on this subject has
arisen in the context of parental custody disputes. That is not the case here. The visitation sought
herein, under the facts of this case, is more analogous to post-adoption visitation as the contest is
between a biological parent and a third party, good samaritan caretaker.
In their summations, Gertrude W. asked the Court to deny the Petitioner's request for
visitation because ISAIAH has spent eleven continuous years with her and her family with
minimal contacts from his mother and zero contacts from the Petitioner. ISAIAH's roots are in
her home and in her family and his stability is there. ISAIAH relates to Gertrude W. as his
mother, to her son as his father, and to her grandson as his brother. He has flourished and done
well under her care and she believes that introducing the Petitioner into ISAIAH's life would be
disruptive and not in his best interests. The Law Guardian joins Gertrude W. in asking the Court
to deny visitation. She points to the protracted absence between the child and the father due to his
lengthy incarceration. During the Petitioner's absence, the child has become psychologically
bonded to Gertrude W. and her family despite having no biological connection to them. She
points out that during the in camera interview ISAIAH could not be persuaded to visit
with the Petitioner under any circumstances. She recalled how he spoke of being unable to
concentrate once he learned of the Petitioner and how his school work declined. She commented
about how the child acknowledged that the Petitioner might want to tell him about himself and
where he's been all this time but that her client expressed absolutely no interest in telling the
Petitioner how he feels toward him for not being a part of his life. ISAIAH flatly said he "doesn't
have any feeling" about this. The Petitioner maintains that while he lived an unsavory life before,
he is reformed now, leading a new, productive, drug free, meaningful life contributing to society
through his church. He argues that he is the father and his past notwithstanding, he is entitled to
visitation to help the child exit from the "dream world" he has been living in, thinking that
Gertrude W. is his mother and Ian A. is his father. He argues Gertrude W. is too old to be raising
an eleven-year-old child and if something happens to her, ISAIAH will need his father then
because she has done nothing to secure ISAIAH's future since neither she nor Ian A. have
adopted him. The Petitioner faults Gertrude W. for not ensuring that ISAIAH has contact with his
sister Destiny who lives upstairs in the same building with Mary F. and suggests this is proof that
Gertrude W. is undermining his ability to have a relationship with ISAIAH by influencing the
child to refuse contact with him.
While the case law holds that visitation is a joint right of the parent and the child
(Twersky v Twersky, 103 AD2d 775 [2d Dept 1984]), these two individuals do not stand
on equal footing in a custody or visitation contest. If a child does not wish to have visitation with
a parent, the child's "expressed wishes are not determinative" (Hughes v Wiegman, 150
AD2d 449, 450 [2d Dept 1989] but merely "one factor to consider" (Taylor v Rivera, 261
AD2d 947 [4th Dept 1999]; Clara L v Paul M, 251 AD2d 22 [1st Dept 1998]), whereas
the noncustodial parent's wish for visitation must be granted "in the absence of a 'pressing
concern' and proof that visitation is 'inimical to the welfare of the child'" (Katz v Katz, 97
AD2d 398 [2d Dept 1983] citing Quinn v [*6]Quinn, 87
AD2d 643 [2d Dept 1982] and Petraglia v Petraglia, 56 AD2d 923 [2d Dept 1977]). This
is so because of "the foreseeable changes that occur in children as they mature [and their]
periodic reorientations toward one or another parent" (Dintruff v McGreevy, 34 NY2d
887, 888 [1974]).
The visitation issue at bar does not arise in the context of a matrimonial action or a custody
proceeding between parents, as in the foregoing line of cases. Gertrude W. is a person unrelated
to ISAIAH but who has been his caretaker for all but nine or ten months of his life. His home is
with her. He knows her adult son, Ian A., as his father and he regards Ian's son, Akeem, as his
brother. The Court is able to discern, even without the aid of a forensic assessment or expert
testimony, that Gertrude W., Ian A. and Akeem A. are ISAIAH's psychological and surrogate
family to whom he is fiercely bonded. Gertrude W. was ISAIAH's "safety net" when Sharon F.'s
instability and the Petitioner's multiple incarcerations left him without biological parents to care
for him. Both of ISAIAH's parents have been absent from his life for so long that their parental
roles, duties and functions have escheated to Gertrude W. and her son. Indeed, on this record, had
child protective proceedings, termination of parental rights or adoption proceedings been brought
against the Petitioner and Sharon F., findings would have been entered on the grounds of
abandonment since each biological parent has "evinced an intent to forego their parental
obligations as manifested by [their] failure to visit and communicate with the [child's caretaker],
although able to do so and not prevented or discouraged from doing so by the
[caretaker]."[FN4] Believing
that ISAIAH was with his maternal grandmother, the Petitioner allowed years and years to pass
without so much as a card, letter or phone call to him at the maternal grandmother's home. On
this record, the Petitioner has forfeited his right of access to this child (Heyer v Heyer,
112 AD2d 539, 540-541 [3rd Dept 1985]).
Over the past ten years ISAIAH has lived with Gertrude W. and her extended family, he has
developed a precious, loving, close, continuous and meaningful relationship with them. The
Court can discern, even without the aid of a forensic evaluation or expert testimony, that this
child has been with Gertrude W. through the most important developmental stages of his life and
because he came to her as an infant, the bonding and attachment he has with her is as strong as it
would be if he had lived with a biological parent for this period of time. It is not beyond the
Court's ability to recognize, even without the aid of expert testimony from a psychologist, that
causing stress fractures to this bond would be ill-advised at a time when ISAIAH is entering early
adolescence, which is typically a time when children are preoccupied with the physical changes
of puberty and experience intense fears of vulnerability over not fitting in with a peer group.
Tearing the fabric of this child's security blanket at a time when a sense of protection and feelings
of belonging are essential to developing independence, could be traumatic and
counter-productive to the developmental tasks this child is struggling to accomplish. As we so
often see in the Family Court, the consequences of forcing children to do some something in
which they have no investment, such as visiting with someone who is a total stranger, against
their wishes and before they are psychologically ready, can create a range of emotional problems
and adjustment disorders.
The Petitioner recollects he last saw ISAIAH when he was two years old and living with
[*7]Sharon F. when she lived on Putnam Avenue between
Tompkins and Throop. This cannot be true since ISAIAH was in the sole and continuous custody
of Gertrude W. by then. The Petitioner admits he has had no contact with ISAIAH, from the time
he was incarcerated in 1996 through the present date. His motivation in seeing ISAIAH now is
"to get to know what my son is like." The Petitioner has reacquainted himself with his sons
Timothy and Lamont who are twenty-three and twenty years old. He "wants to be a father to him"
and "wants [his children] to know he is [their] father and loves them in spite of [his] past." The
Petitioner explained he wants ISAIAH "to know he has siblings and blood relatives...and to get to
know them." When asked if he thought having contact with him would be disruptive to ISAIAH's
life, the Petitioner remarked that "a normal child would want to now who his father is" and
compared ISAIAH to himself wanting to know who his father was when he was a youth. The
Petitioner testified he believes ISAIAH "has a right to know who his father is" and as a father, he
has "in spite of his past...a right to have a relationship with him." In discussing the child's wishes,
the Petitioner commented, "I know he said he doesn't want to have anything to do with me and I
believe someone put that idea in his head." When asked how he would go about building a
relationship with ISAIAH, the Petitioner said he would "explain to him why I wasn't there and let
him know I am not the person he has been told I was. I feel deeply that what he has been told
about me is not his father; I have love for him; I would let him know people make mistakes." He
testified they would do "father/son stuff" like going to the park, movies, church and "let him see
how I am now, not that other guy." Referring to his siblings, the Petitioner testified that "he has a
brother who is 6'4 and I know he would be fascinated by that; he has another brother who is 6'2
and 300 pounds, he'd be fascinated by that; he has cousins and uncles he never saw before."
Simply put, there is no relationship between the Petitioner and ISAIAH to rehabilitate
through a graduated plan of visitation beginning with supervised visitation and progressing to
unsupervised contact (Robert TT v Carol UU, 300 AD2d 920 [3rd Dept 2002]). Ordering
visitation at this point in ISAIAH's life would be for the purpose of creating a
relationship with the Petitioner which, at this stage of the child's life and psychological
development, is almost impossible to do (Thaxton v Morro, 222 AD2d 955, 956-957 [3d
Dept 1995]). It is clear from the Petitioner's testimony that he expects the court to enforce his
"rights" and ignore his failure to carry out the "responsibilities" to this child over the past ten
years, upon which these rights are predicated. While he acknowledges that his pursuit of
visitation may be disruptive to the child's life, he demonstrates no awareness of the emotional
turmoil his application for visitation has created and can precipitate for the future. He is willing
to sacrifice ISAIAH's emotional well-being so that he can be assimilated into his biological
family with whom the child has never had contact. Although the Petitioner is aware ISAIAH
"doesn't want to have anything to do with [him]," he conveys no understanding or acceptance of
the roots of the child's feelings, preferring instead to believe in a paranoid fashion and without
any factual basis, that the "child does not want to visit with him because someone put that in his
head." The facts show Gertrude W. had no negative information about the Petitioner to do this
even if she were so inclined and consequently, ISAIAH has no preconceived ideas about the
Petitioner which he has to overcome or undo. A parent's inability to see conflicts in a child and
deal with them is inimical to the welfare of the child.
Finally, this Court is aware that children of adoption desire and do seek out their birth [*8]parents for a variety of reasons, e.g. satisfying a curiosity, quelling a
deep-seated sense of loss, and fulfilling a desire to have a relationship. ISAIAH may wish, at
some point in time, to know Timothy J. but on this record, it should be on his terms, not the
Petitioner's. This Court firmly believes that forcing ISAIAH to have contact and visitation with
the Petitioner is inimical to the welfare of the child (Iadicicco v Iadicicco, 270 AD2d 721
[3rd Dept 2000]) and would result in significant emotional harm to him. ISAIAH has suffered the
abandonment of his mother and his father. Emotionally he should not be placed in a position
where he is at risk of re-abandonment. The Petitioner is on parole after being incarcerated twice
for significant periods of time and his circumstances are precarious - fighting addiction is a
life-time struggle and returning to a life of crime on the streets is always available. The longevity
of his housing situation living with an aged wife in a facility reserved for the elderly is also
uncertain.
DECISION
This Court has weighed the
testimony, character, temperament and sincerity of the parties involved and has reflected upon
the feelings expressed by the child. Based on the totality of the circumstances, this Court finds
extraordinary circumstances exist to deprive the Petitioner of visitation with ISAIAH. The factors
set forth above demonstrate compelling reasons and substantial evidence that visitation would be
detrimental to the welfare of the child and is contrary to his best interests at this time.
As the Petitioner knows where Gertrude W. and Ian A. can be contacted, he is to provide
them with his address and telephone number and keep them informed of any changes to that
information. Gertrude W. is to keep the Petitioner's address and telephone number and when, as,
and if ISAIAH expresses an interest in contacting the Petitioner, she will have the means
available for him to do so. Accordingly it is ordered that the petition is dismissed.
E N T E R :
__________________________________
PAULA J. HEPNER, J.F.C.

Footnotes

Footnote 1: A neglect petition was filed
under Docket NN-_____/98 against Sharon F. and the child was released to the custody of
Gertrude W..

Footnote 2: In addition to ISAIAH, the
Petitioner and Sharon F. had two other children together, Lamont Johnson and Timothy J. who
reside in North Carolina with their maternal grandmother, Margie F.. Mary F. testified the
Petitioner is the father of the child Destiny, who resides with her, but he did not identify her as
one of his children when he testified.

Footnote 3: New York statutory law sets a
high standard for outright prohibition of visitation and is applicable in a limited number of cases.
A court may not make an order for visitation with a parent who has been convicted of murder in
the first or second degree against of the parent, legal custodian, legal guardian, sibling,
half-sibling or step-sibling of the subject child [Domestic Relations Law §240 1-c (a)]. The
law outlines limited circumstances in which the court may enter an order of visitation in cases
where a parent has been convicted of murder of one of the above-named persons [Domestic
Relations Law §240 1-c (b)]. New York case law has expanded the instances in which
visitation is prohibited based upon a parent's conviction of violent crimes (Russo v
Russo, 282 AD2d 610 [2d Dept 2001])(attempted murder). 

Footnote 4: McKinneys, Social Services
Law of New York, §384-b(5).