Matter of Michael J. v Sherrie H. (2024 NY Slip Op 51880(U))

[*1]

Matter of Michael J. v Sherrie H.

2024 NY Slip Op 51880(U)

Decided on January 11, 2024

Family Court, Kings County

Menon, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 11, 2024

Family Court, Kings County

In the Matter of an Article 6 Proceeding

Michael J., Petitioner,

against

Sherrie H., Respondent.

File No. 202205

Kira J. Schettino, Esq., 80 S. Swan St. Fl. 11, Albany, NY 11210 for Respondent Sherrie H.

Mindy L. Gress, Esq., 44 Court St. Suite 906, Brooklyn, NY 11201 for Petitioner Michael J.

Rayana Baum Lifson, Esq., Children's Law Center, 44 Court St., Fl. 11, Brooklyn, NY 11201 for Child M.

Nisha Menon, J.

In this proceeding for an order of visitation filed pursuant to Article 6 of the Family Court Act, Petitioner father Michael J. (hereinafter "Petitioner" or "Mr. J.") seeks an order of parenting time with the subject child, M.J., DOB 2007 (hereinafter "M." or "the child"), the son of both parties. Mr. J.'s petition, filed on January 16, 2016, asserts that visitation is in M.'s best interest so that he and Mr. J. can bond, and so that M. can know who his father is. Mr. J.'s petition alleges that he hasn't seen his son since his incarceration [FN1]
"due to Ms. H." in reference to M.'s mother, the respondent herein, Sherrie H. (hereinafter "Respondent" or "Ms. H.").

History

Trial commenced on December 6, 2017 and continued on March 5 of 2018, August 22 and October 7 of 2019, and February 21 of 2020, concluding testimony on July 1 of 2022.[FN2]
At the request of Mr. J. and the attorney for the child, an in camera interview with the child was held on October 26, 2023, after over 15 months of delays resulting from scheduling conflicts with the child and the child's attorney.[FN3]

Mr. J.'s direct case included his own testimony and testimony from his current wife, D.J. In addition, Mr. J. entered documentary evidence, including temporary orders of visitation and orders granting county pay for visitation supervisors in the instant matter, several photos of him with M., and a text message from M. Ms. H. also testified on her own behalf, and the attorney for the child called Mr. J. to testify in her case, and sought an in camera interview with her client. All counsel filed written summations by December 8, 2023.

This Court had the unique opportunity to assess the credibility, truthfulness and demeanor of both parties and D.J. during testimony over several trial dates, as well as during pre-trial conferences held in 2016 and 2017 and the status conferences held throughout trial into 2022. In general, all three witnesses presented as credible and sincere. Likewise, the child's testimony during his in camera interview was credible and consistent with the position put forth by the child's attorney throughout this proceeding—specifically, that the child opposes any order of visitation.

It is undisputed that M. and Mr. J. had a positive relationship preceding Mr. J.'s incarceration, which occurred prior to the child's fourth birthday. Mr. J. resided with Ms. H. and the child at his birth, and after he moved out when the parties separated, he continued to see M. regularly, spending significant amounts of time with him and generally caring for him. Mr. J.'s relationship with M. only began to deteriorate during Mr. J.'s incarceration. M. visited Mr. J. once while he was being held at Riker's Island, and during Mr. J.'s year at Riker's before he was convicted and issued a prison sentence, he spoke with M. by phone frequently. Mr. J. testified that he and M. spoke every other day: he would call Ms. H., and she would put M. on the phone. [*2]Mr. J. testified that these phone calls stopped occurring, but he did not offer an explanation as to why. Ms. H. agreed that Mr. J. and M. spoke frequently by phone in that period. Mr. J. also wrote letters to M., but never received a response. Throughout the life of this case, on several occasions, Ms. H.'s attorney raised that the letters Mr. J. sent to M. were derogatory and harassing toward Ms. H., and inappropriately questioned the child about Ms. H.'s personal life.[FN4]

Mr. J. commenced this proceeding while he was still incarcerated, and as a result, court-ordered visits were limited to telephone for the remainder of his incarceration. At the urging of the attorney for M., these calls were ordered to be supervised. By all accounts, phone contact was sporadic for an unfortunate confluence of reasons, including availability of all parties involved and restrictions from the various correctional facilities where Mr. J. was housed in that period. It is undisputed that in the two years that telephone visits were ordered, only a handful occurred.

Upon Mr. J.'s release, on consent of all parties and the child, this Court ordered weekly, in-person visits for four hours commencing on August 1, 2018. That order was discontinued at the next court date in November of 2018 when Mr. J.'s attorney contacted the court to inform the court and counsel that Mr. J. was withdrawing his petition. Mr. J. was directed to file a notice of withdrawal and never did so; at the next court appearance in January of 2019, it was put forth that Mr. J. was not withdrawing his petition, but that he was having contact with M. absent a court order. At that time, Ms. H. raised that M. was coming home from visits crying, and that Mr. J. continued to inappropriately question M. about Ms. H.'s personal life including making derogatory remarks about her partner with whom M. has a close relationship, which upset M. Without an updated position on visits from the child at that appearance, this Court declined to issue a new visitation order. At the next court date in April of 2019, the relationship between Mr. J. and M. remained strained, and Ms. H.'s attorney reported that she had blocked Mr. J. from calling her due to a reported threatening text message Mr. J. had sent to the family. Ms. H. remained willing to facilitate the visits, but only if M. wanted to visit with Mr. J. Continued trial dates were scheduled.

At the appearance for trial in August of 2019, in colloquy, the attorney for the child opposed an order for visits, but at this Court's urging, revisited the topic with M., who was present in court on the day of trial, and agreed to a visit that day, as well as weekly visits thereafter. By October 2019, both Ms. H. and the child opposed visits. Both reported that Mr. J. continued to question the child inappropriately about Ms. H. M.'s attorney reported that Mr. J. had sent M. photos of his child support payments and of court orders, and that M. had overheard Mr. J. urging Ms. H. to terminate his support, and inquiring about when he could sign away his parental rights. While Ms. H. opposed visits at that time, her position remained that she would support any visitation arrangement that M. wanted. Over the objection of the attorney for the child, this Court ordered therapeutic visits between M. and Mr. J. to be facilitated by either an agency or by M.'s individual therapist, if deemed appropriate. This order was continued on several court dates into 2021, yet these visits never occurred. Although neither parent testified directly as to why, Mr. J. acknowledged that he never contacted M.'s therapist or any agency to explore beginning such services.

In July of 2021, Mr. J. sought an order for unsupervised parenting time, and all consented to alternate weekly visits for four hours at a time. At this time, as expressed by his attorney, M. was agreeable to contact with Mr. J., albeit limited to day visits. While M. opted to cancel several visits, he did attend a few, and at the October 2021 appearance, his attorney supported keeping the order in place; however, by December 2021, the visits had again discontinued altogether. According to M.'s attorney, Mr. J. continued to disparage Ms. H. to him, as well as other family members important to M., which upset M. and made him unwilling to visit with his father. Ms. H.'s attorney agreed with this position and stated that Ms. H. continued to encourage M. to visit. In his testimony, Mr. J. acknowledged sharing such orders with M., and said he did so in response to M.'s requests for certain items, telling him to ask his mother for the money. Mr. J. denied disparaging Ms. H., and alternatively said that he could not remember; the Court did not find this particular testimony credible, as compared to Mr. J.'s relatively specific recollections of other events involving M. and their contact. Thereafter, it was clear that a settlement was unlikely to be reached, and a final trial date was scheduled. Trial concluded with Ms. H.'s testimony, much of which addressed her involvement in facilitating M.'s visits with Mr. J., by answering Mr. J.'s calls, transporting M., and encouraging him to visit. In addition, Ms. H. testified to observing M. to be angry upon return from many visits with his father, to her belief that M.'s recent engagement in individual therapy had benefitted him emotionally and mentally, and to her belief that M. has been doing better since he discontinued contact with Mr. J.

Finally, it is worth noting that during the February 2020 trial date, while Mr. J. was being cross examined by Ms. H.'s attorney, Mr. J. had a brief outburst where he expressed anger at the court proceeding and its participants, repeatedly stated his intent to "sign his rights over" and berated Ms. H. Mr. J. ultimately agreed to continue with testimony, but indicated that he did so out of spite, stating "Well, we're going to waste our time. You all want to waste my time. I'll waste your time too, so we're going to keep going. That's it. So let's go." (2/21/20 Tr. at 12, lines 20-25). While the Court does not take Mr. J.'s statement made in the context of an emotional court case as reflective of his ultimate position, it does support Ms. H.'s and M.'s position that Mr. J. has been volatile and negative during some of his contact with M.

Decision

This case presents the challenge of issuing a court order that will aide in promoting the child's best interests in a family dynamic where, despite various efforts to encourage successful and positive visits, the child remains steadfast is his desire not to be court ordered to visit with Mr. J.

It has long been recognized that the right to parent is a fundamental, constitutionally protected right. "A noncustodial parent should have reasonable rights of visitation, and the denial of those rights to a natural parent is a drastic remedy which should only be invoked when there is substantial evidence that visitation would be detrimental to the child. Paul G. v. Donna G., 175 AD2d 236, 572 N.Y.S.2d 364 (2d Dept. 1991), citing Matter of Hughes v Wiegman, 150 AD2d 449; Katz v Katz, 97 AD2d 398. However, "[i]t is also well to consider the attitudes of the law on parental visitation. Sometimes referred to as a "natural" parental right, this appellation is too narrow. It ignores the primacy of the child's welfare." Weiss v. Weiss, 52 NY2d 170, 418 N.E.2d 377 (1981). Accordingly, visitation is a joint right of the parent and the child. Id. Beyond the rights and equities involved in court-ordered family arrangements, the Family Court is charged with upholding the best interests of the child. Friederwitzer v [*3]Friederwitzer, 55 NY2d 89 (1982). Indeed, "[t]heir interests are paramount. The rights of their parents must, in case of conflict, yield to that superior demand." Koppenhoefer v. Koppenhoefer, 159 AD2d 113, 558 N.Y.S.2d 596, (2d Dept1990), citing Lincoln v. Lincoln, 24 NY2d 270, 299 N.Y.S.2d 842, 247 N.E.2d 659. Where a child is of sufficient age and capacity to convey their position, the court must also take this into account. "While the express wishes of children are not controlling, they are entitled to great weight, particularly where their age and maturity would make their input particularly meaningful." Id.

In this Court's view, the facts and circumstances of this case compel an order that affords M. significant input in when and how he has contact with his father. While this Court recognizes the risks inherent in deferring, to some extent, to the determinations of the child, it is also this Court's view that here, affording M. significant input is the most effective and likely way to promote M.'s best interests amidst the very real context of a deeply strained family dynamic that has not improved with court involvement. Unfortunately, it is indisputably the case here that visitation has been ordered in many forms over the past six years without lasting success. This Court has vacated trial dates and permitted prolonging of the matter so that different modalities of visitation could be attempted in an effort to promote reunification. Throughout these efforts, although M. has refused some visits, he has also demonstrated a lot of emotional resilience and willingness to keep trying to have a relationship with Mr. J., and he has showed up for visits that he did not wish to attend, acting in good faith throughout this proceeding.

Although Mr. J. argues that M.'s reticence to visit stems from Ms. H.'s alienating M. from him, there is no evidence to support this. To the contrary, the evidence presented demonstrates that Ms. H. has cooperated with the orders of this Court, that she has encouraged M. to make amends with his father and to maintain a relationship, and that she has never wavered from her position of supporting the child in his own determinations of what is best for him emotionally in his relationship with Mr. J. Ms. H.'s decisions and actions demonstrate those of an involved and loving parent who is trying to support her child through a painful situation.

In reality, the evidence presented strongly indicates that M.'s resistance to being court ordered to visit with Mr. J. stems, in large part, from M.'s experience with Mr. J. disparaging Ms. H. and other relatives to M., questioning M. about Ms. H.'s personal life, questioning M.'s relationship with his stepfather, and inappropriately sharing information about the parents' child support arrangement, in a way that has made M. uncomfortable on several occasions. While this Court was not presented with any documentary evidence of the alleged instances of disparagement or harassment [FN5]
, this is undoubtedly M.'s perception, one which did not change over the course of several years and under various formations of visitation that ensued under the temporary orders of this Court. That M. was upset, angry or hurt by his father's choice to use visitation time to disparage Ms. H., to inquire about Ms. H., or to disparage other family members who are beloved to M. was reported to this Court time and again by M.'s attorney, and many times by Ms. H. and her attorney. The in camera interview with M. also unequivocally confirmed this. Although Mr. J. denied harassment and disparagement of Ms. H., he was not credible on this issue. Mr. J. also acknowledged inappropriately sharing court orders and information about child support payments with M., which undermined his denial of [*4]inappropriate communications with M. Finally, Mr. J. admits that for long periods of time, Mr. J. chose not to communicate with M. by text or phone despite being permitted to so by the Court because he was unhappy with M.'s attitude. This too has put a strain on their relationship.

There is no doubt that Mr. J. loves M., wants a positive parent-child relationship with his son, and is hurt by M.'s ongoing refusal to have consistent contact with him. Mr. J. also poses no physical risk to M. At the same time, Mr. J.'s behavior toward M. has alienated him and put a strain on their relationship, causing M. anguish and psychological distress over several years. This is not a case where a child refuses court-ordered contact with a parent without reason. It is both logical and reasonable to this Court that, if Mr. J.'s words and actions pitted him against Ms. H. and other family members, M. would feel estranged from Mr. J., and would not wish to spend time with him; here, the bulk of the evidence supports this finding. To force visitation on M., who is now 16, while he continues to feel alienated from his father due to his father's own choices, would not only further harm M. emotionally and psychologically, it risks substantial further deterioration of their relationship, neither of which is a goal of this Court.

Notably, despite the pressure and strain, M. has never posited that he wants no relationship with his father; he has simply asked not to be court ordered on a schedule. This demonstrates a remarkable resilience and emotional maturity in M., weighing further in favor of affording M.'s position considerable weight. While this Court takes seriously its charge to uphold the legal rights of both parents and children, the best interests of the child are ultimately paramount. Here, there is simply no way to grant Mr. J. the regular visitation schedule he desires without subjecting M. to the emotional and psychological harm he experiences when court ordered to visit. Accordingly, this Court finds that court-ordered visitation is antagonistic to M.'s best interests, and, therefore, is not appropriate here. In this Court's view, empowering M. to set limits on his relationship with Mr. J. is the best way to protect M.'s best interests while also creating appropriate circumstances to promote the parent-child relationship.

Accordingly, for the reasons set forth above, it is hereby

ORDERED that the petition for visitation is DENIED with respect to establishing a regular visitation schedule; and it is further

ORDERED that Ms. H. shall ensure that M. shall keep Mr. J. apprised of his mailing address and phone number until the age of 18, so that Mr. J. may continue to mail letters, cards, texts and other written communications to the child without restriction; and it is further

ORDERED that Mr. J. is not to disparage Ms. H. or other family members to M. or to inquire about Ms. H. or other family members to M.

This constitutes the Decision and Order of the Court. Notify parties and counsel.

Dated: 1/11/24

Footnotes

Footnote 1:Mr. J. was incarcerated from 2011-2018

Footnote 2:The logistical challenges of having a litigant who is incarcerated be made available for trial, the COVID-19 pandemic, and scheduling conflicts among counsel all contributed to delays in completing trial.

Footnote 3:The in camera interview had to be rescheduled several times due to emergency issues relating to the child and his family. After the third cancellation, Mr. J.'s attorney opposed further delay and the Court indicated the matter would be decided without an interview of the child. This Court entered an order granting the attorney for the child leave to move for reconsideration of the in camera interview, given the severe scheduling delays. It was this Court's view that the child's position had been sufficiently conveyed by his counsel, and that further delay to disposition exposed the family to emotional and psychological harms that result from the stress of court proceedings and generally from a lack of resolution to the family's fissure. However, the child's attorney moved to file an affidavit with the child's position or, alternatively, to schedule the in camera. At that time, Mr. J. opposed submission of an affidavit and argued in favor of holding an in camera, which Ms. H. did not oppose. Accordingly, this Court held the in camera interview.

Footnote 4:As a result, many of this Court's visitation orders directed Mr. J. not to disparage Ms. H. to the child, or to question the child about her in any way.

Footnote 5:Though the Court bore witness to Mr. J's disparagement of Ms. H. on 2/21/20, as described supra.