[925 NYS2d 417]

In the Matter of ALAIRE K.G., Respondent, v ANTHONY P.G., Appellant.

First Department, May 31, 2011

## APPEARANCES OF COUNSEL

*Law Office of Randall S. Carmel*, Syosset (*Randall S. Carmel* of counsel), for appellant.

*Anne M. Crawley*, Sunnyside, for respondent.

*Karen P. Simmons, The Children's Law Center*, Brooklyn (*Barbara H. Dildine, Janet Neustaetter* and *LaShonne Watts* of counsel), Attorney for the Child.

## OPINION OF THE COURT

MOSKOWITZ, J.

This appeal, involving a custodial parent's request to relocate with the parties' child, falls within the class of cases that "present some of the knottiest and most disturbing problems that our courts are called upon to resolve" (*Matter of Tropea v Tropea*, 87 NY2d 727, 736 [1996]).

The parties were married in January 2004, separated about a year and a half later and were divorced on July 13, 2006. They are the parents of a now six-year-old boy born on May 17, 2004. The stipulation settling the divorce case granted the mother legal and physical custody of the child. The father had visitation every week from Monday at 8:00 A.M. until Wednesday at 6:00 P.M. The stipulation allowed relocation within 25 miles of the father's house in the Bronx.

The father has had a history of irregular employment and is currently not employed. At the time of trial, the mother, who is remarried, cared for her younger child from her second marriage, full time.

After the parties separated, the mother remained in the marital apartment in the Bronx with the child for two years. In the fall of 2007, she began working as a project administrator in the construction field. In 2007, she moved with the child and her boyfriend to Connecticut. The mother testified that she always wanted her son to be in a suburban environment. She stated

that she was trying "to mirror my own childhood. I had a wonderful suburban upbringing." The relationship in Connecticut ended when the boyfriend returned to his native New Zealand. The mother returned to New York with the child and moved into an apartment in Harlem.

In January 2008, the mother met her future husband, Hugh Bonnar, on Match.com. Bonnar was retired from the Air Force, lived in North Carolina and was then involved in a nationwide job search. Ultimately, Bonnar took a job with Northrop Grumman in San Diego. He had requested to work at Northrop Grumman's Long Island branch, but the company could not accommodate his request. The mother and Bonnar became engaged in May 2008.

Soon after her engagement, the mother approached the father about moving to California to live with Bonnar. The father was concerned about the distance and the stability of the mother's new relationship. The parties therefore met with a mediator to try to work out an arrangement by which the mother could leave the child with the father temporarily while she settled in California. The mediator sent a letter, dated May 12, 2008, that purported to memorialize the parties' agreement. The letter stated that the parties agreed that the child would stay with the father from June 27, 2008 until December 31, 2008, with the mother making several long weekend visits to New York. Mother and son were also to participate in a webcam phone call two to three times a week. The letter did not address where the child would live after December 31, 2008. However, the father refused to sign an agreement embodying these terms and instead asked the mother to sign over custody to him. She refused. The mother left for California on June 26, 2008. She claims that she never intended the father to have permanent custody, but arrangements to move to California had become irreversible by the time she learned that the father did not agree.

The mother gave birth to Bonnar's son on April 4, 2009. She and Bonnar were also married in April 2009.

On July 17, 2008, the father filed a petition seeking sole legal and physical custody of the parties' child, claiming that the mother had abandoned the child. On December 1, 2008, the mother filed a petition for relocation. The court consolidated the two petitions. Before the hearing, the father withdrew his petition for sole custody. Accordingly, the court considered only the relocation application.

It was not until August 2009 that a two-day hearing finally took place. The parties were the only witnesses. The court did

not issue a decision until almost a year later, on July 19, 2010, granting the mother's relocation petition. During the time the parties were waiting for the court's decision, the child continued to live with the father. After the court's decision was issued, the child moved to California in compliance with the court's order.

"[E]ach relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child" (*Matter of Tropea* v *Tropea*, 87 NY2d 727, 739 [1996]). Among the factors the court must consider are: (1) "each parent's reasons for seeking or opposing the move," (2) the quality of the child's relationship with each parent, (3) the impact of the move on the child's future contact with the noncustodial parent, (4) the degree to which the move may enhance the custodial parent's and child's life economically, emotionally and educationally, and (5) "the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements" (*id.* at 740-741). The dissent states that *Tropea* dictates that the court's "central concern" should be the impact of the move on the relationship between the child and the noncustodial parent. This interpretation misreads the case. *Tropea* states that "[o]f course, the impact of the move on the relationship between the child and the noncustodial parent will remain a central concern" (*id.* at 739). However, it is not "the" central concern. Rather, the case makes abundantly clear that "it is the rights and needs of the children that must be accorded the greatest weight" (*id.*). Indeed, the Court of Appeals rejected the "three-tiered" analysis that required a court to determine first "whether the proposed relocation would deprive the noncustodial parent of 'regular and meaningful access to the child' " (*id.* at 736).

Family Court recognized the *Tropea* factors and analyzed this case accordingly:

> "While it is true that Mother was young when Aodhan was born, there is no question now that she is in a stable relationship, remarried and that her financial situation dictates that her family live where her husband can make a living. The benefits to the child were demonstrated[,] by testimony and documentary evidence, as a suburban middle class lifestyle, public school with every possible amenity available at no cost, comprehensive health insur-

ance, a stay at home mother, easily available excellent physicians, a positive post-divorce family unit and most importantly, the benefits of the child growing up with his younger brother on a daily basis.

"The Court recognizes and agonized at great length over the impact of the relocation on the child's ability to maintain a consistent, ongoing and meaningful relationship with his Father. The visitation schedule set forth hereinafter is designed to mitigate such impact, given the distance between New York and California."

There is no reason to disturb the findings of the court, that had the opportunity to hear the parents testify and had an in camera meeting with the child (*see Matter of James Joseph M. v Rosana R.*, 32 AD3d 725, 726 [2006], *lv denied* 7 NY3d 717 [2006] ["Custody matters are within the sound discretion of the Family Court, and its findings should be accorded great deference on appeal since that court was in the best position to evaluate the testimony, character, and sincerity of the parties" (internal quotation marks and citation omitted)]). There is a sound and substantial basis in the record for the determination granting the mother's request to relocate to California with her son (*see id.*).

First, there is no question that the California home is financially more stable than the father's home. The stepfather has a steady job with Northrop Grumman that provides his family with health insurance. By contrast, the father is not currently working. Although he has been offered a job as a teacher's aide, he has postponed his start date. He is currently on some type of public assistance and receives money from his parents in Ireland. He readily admits that "it's not been easy like money wise." He is not currently in a relationship. Given his bleak financial circumstances, with no career or family in New York, it would appear that there is nothing keeping the father from moving to San Diego himself to be closer to his son (*see Tropea*, 87 NY2d at 740 ["where the custodial parent's reasons for moving are deemed valid and sound, the court in a proper case might consider the possibility and feasibility of a parallel move by an involved and committed noncustodial parent as an alternative to restricting a custodial parent's mobility"]; *Thompson v Smith*, 277 AD2d 520, 522 [2000] [noting the feasibility of a parallel move where the father's "single lifestyle and his skills as a self-employed machinist and part-time baker are readily transplantable"]).

Further, living in San Diego ensures that the child will grow up in the same house as his half brother (*see Matter of Smith v Bonvicino*, 50 AD3d 806, 807 [2008] ["the mother demonstrated that the proposed move (to Oklahoma) will allow the child to benefit from an enhanced relationship with her half brother and the improved economic opportunities for the mother"]). The father agreed that it was very important for the child to have a brother in his life. He even testified that he actually expected the child eventually to move to California so that he could be with his brother; the father was merely opposed to the date of the move. The mother established that the child would have access to an education that was just as good as, if not better than, his school in New York. Moreover, she testified that Bonnar's status as a veteran will allow the child to attend college within the State of California's university system free of charge.

The record also reflects that the mother went out of her way to facilitate communication between the child and his father. The same could not be said of the father with respect to communication between the child and his mother. Finally, the child's own attorney recommended that the court permit the mother to relocate with the child, a factor that militates in favor of affirming the result the court reached (*see Matter of Caravella v Toale*, 78 AD3d 828, 828 [2010] [determination that it was in the best interests of the children to allow them to relocate to California where their father lived was consistent with "the recommendation of the court-appointed forensic evaluator, and the position of the attorney for the children, which are entitled to some weight"]; *see also Matter of Aruty v Mormando*, 70 AD3d 683 [2010]).

The dissent's characterization of the mother as putting her own romantic interests ahead of her son's welfare is rank speculation. It is just as likely that the mother, herself an only child, was pursuing marriage aggressively to produce a sibling for her son, before he became much older, and an intact family. Regardless of the mother's motivations, it is the best interest of the child that must guide our decision. Relocation ensures that the child will live in a family that is stable financially. He will be with his brother. The amount of time spent with his father will diminish. However, we find that the visitation schedule, that requires the mother to pay for air travel for the child to be with the father on numerous extended weekend visits throughout the year in addition to extended summer and holiday visits,

does not deprive the father of the opportunity to maintain a close relationship with his son (*see e.g. Matter of Smith*, 50 AD3d at 807 [2008] ["While the loss of the father's weekend and occasional midweek parenting time (due to a move to Oklahama) is not insignificant, the parenting time provided for by the Family Court allows for the continuation of a meaningful relationship between the father and the child"]).

Accordingly, the order of the Family Court, Bronx County (Annette L. Guarino, Ref.), entered on or about July 9, 2010, which granted the mother's petition to modify the judgment of divorce, Supreme Court, Bronx County (Ira Globerman, J.), entered on or about July 13, 2006, to permit her to relocate to California with the parties' child, should be affirmed, without costs.

SAXE, J. (dissenting). The petitioning mother, who seeks to relocate the parties' child from New York to San Diego, has demonstrated that she puts her own romantic interests ahead of the best interests of her son. A young child is entitled to the stability and security created by the presence, guidance and love of both his parents in his day-to-day life. Yet, by her actions, this mother has shown herself unconcerned with protecting her son's right to the guidance and love of both his parents. Her desire for a romantic partner has taken precedence over the paramount interest of the child in maintaining the vital parent-child bond with both his parents. As a legal matter, the showing made by the mother fails to justify allowing her to relocate the parties' young son to a home more than 3,000 miles from his father.

From the time of the parties' divorce in 2006, when he was two years old, the child spent three days every week in his father's home; since the mother moved to San Diego in June 2008 for her new romance, the child has lived at his father's home full time. The major damage that the relocation will cause to the relationship between the child and his father cannot be remedied by what is termed "appropriate visitation," namely, a large part of the child's summer vacation and school holiday periods. No matter how positive the move may have proven to be for the mother, and even accepting that the new home situation offers benefits to the child as well, the relevant factors were wrongly balanced in the trial court's analysis. When the correct weight is accorded to the most important of the factors, namely, the impact on the bond between the child and his noncustodial parent, the conclusion that emerges is that the relocation should not be permitted.

The parties were married on January 26, 2004, and their son was born on May 17, 2004. The mother filed for divorce in June 2005, and a stipulation dated March 14, 2006, which was incorporated into the divorce judgment entered on July 13, 2006, granted the mother primary legal and physical custody of the child and gave the father visitation with the child every Monday morning through Wednesday evening. The stipulation permitted the mother to relocate only within 25 miles of the father's home in the Bronx.

In 2007, the mother moved with the child to live with her then boyfriend in Connecticut (within the 25-mile radius), but that boyfriend soon returned to his native New Zealand to care for his mother, and the mother returned with the child to New York, to find a new apartment and a full-time job.

In January 2008 the mother met her current husband, Hugh Scott Bonnar, on the Internet dating service Match.com; he was recently retired from the Air Force and residing in North Carolina. The two used video teleconferencing to get to know each other, and first met in person in March 2008, when he spent a week at her home in New York. The mother reports that Bonnar sought employment throughout the United States, but was only offered a position at Northrop Grumman in San Diego, California, which he accepted and began in May 2008. The couple became engaged in May 2008.

At around that time, in late April or early May 2008, the mother approached the father about her desire to move to California to live with Bonnar. The father did not agree to her moving with the child. They then consulted a mediator to arrive at an interim agreement that would enable the mother to leave the child temporarily with the father while she settled in California. On May 8, 2008, the parties met with a mediator selected by the mother. A letter dated May 12, 2008, sent by the mediator to each of the parties, purporting to memorialize their agreement, stated that it was agreed that the child would stay with the father for the period from June 27, 2008 to December 31, 2008, with several long weekend visits to New York by the mother and webcam visits two to three times each week. The letter does not address the issue of custody and visitation after December 31, 2008; indeed, in discussing the terms of the purported agreement, the letter does not specifically use the word "custody" at all.

Although the mother had an attorney draft a document that she believed formalized the mediated agreement, the father

refused to sign the document, and, instead, asked the mother to formally sign over custody of the child to him. The mother testified that although she had never intended to agree that the father would have permanent custody, arrangements for her move had proceeded too far to alter, because she had already quit her job and given up her apartment. She left the child with the father and flew to San Diego on June 26, 2008.

The father filed a custody petition on July 17, 2008, seeking sole legal and physical custody of the child, alleging that a change in circumstances had occurred—the mother had abandoned the child. Thereafter, on or about December 1, 2008, the mother filed a petition for relocation. The two petitions were consolidated, and before the hearing, the father withdrew his petition for sole custody, leaving only the relocation application for determination.

The hearing took place in August 2009; the parties were the only witnesses. The evidence established that the mother's new husband is employed by defense contractor Northrop Grumman, that he handles the distribution of parts for particular vehicles manufactured by the company, and that his salary is $60,000 to $80,000 a year. The mother and her new husband were married in April 2009; their son Ian was born on April 4, 2009. They planned to move soon after the hearing, in September 2009, to a suburb of San Diego, which the mother represented has an excellent public elementary school. The mother asserted that because of her new husband's military status, the parties' son would be eligible to attend any four-year college in California's state university system at no cost. According to the mother, her new husband wants to provide a positive role model in the child's life but does not intend to supplant the father in his paternal role. The mother offered assurances that she was willing to allow visitation for almost the entire summer and alternate school recesses, and would pay for the child's transportation expenses to and from New York.

Until the Family Court issued its decision on July 9, 2010, the child continued to reside with the father, making a number of visits to San Diego. The court then granted the mother's petition to modify the parties' 2006 judgment of divorce so as to permit her to relocate to California with the parties' child.

There is no dispute regarding the legal standard to be applied to this proceeding. As enunciated in *Matter of Tropea v Tropea* (87 NY2d 727, 739 [1996]), the ultimate question is "what outcome is most likely to serve the best interests of the child."

*Tropea* directs that appropriate consideration be given to all relevant factors, with no presumptions or threshold showings required, and suggests a variety of factors that may be relevant to deciding such an application, including

> "the good faith of the parents in requesting or opposing the move, the child's respective attachments to the custodial and noncustodial parent, the possibility of devising a visitation schedule that will enable the noncustodial parent to maintain a meaningful parent-child relationship, the quality of the lifestyle that the child would have if the proposed move were permitted or denied, the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships" (*id.* at 740).

The *Tropea* Court also observed that "the demands of a second marriage and the custodial parent's opportunity to improve his or her economic situation[ ] may also be valid motives that should not be summarily rejected, at least where the over-all impact on the child would be beneficial," and that even "the custodial spouse's remarriage or wish for a 'fresh start' [may] suffice to justify a distant move" if it results in "strengthening and stabilizing the new, postdivorce family unit" (*id.* at 739). However, it cannot be overemphasized that "the impact of the move on the relationship between the child and the noncustodial parent will remain a central concern" (*id.*).

In permitting the relocation, the Family Court emphasized that the mother is now in what was termed a stable relationship, that her financial situation dictates that her family live where her husband can make a living, and that substantial benefits will inure to the child by the move. The court seemed to look with great favor on the suburban-type lifestyle described by the mother, which included reportedly excellent public schools, comprehensive health insurance, a stay-at-home mother, and a "positive" postdivorce family unit including a younger brother. The court also placed substantial emphasis on a briefly mentioned, undeveloped point in the father's testimony, in which he said that he anticipated that some time in the future his son would go to live with his mother and new brother, in "maybe a year and a half." Yet the court characterized this testimony as his having "essentially consented" to the sought relocation, "except that he sought to control the timing of the move."

When this Court reviews relocation decisions, it generally considers whether there is "a sound and substantial basis in the record" for the determination (*see Yolanda R. v Eugene I. G.*, 38 AD3d 288, 289 [1st Dept 2007]). However, this Court will reverse a decision if a preponderance of the evidence, when properly weighed in view of the relative importance of each consideration, does not support the trial court's determination regarding the child's best interests (*see Salichs v James*, 268 AD2d 168 [1st Dept 2000]).

Notwithstanding its reference to "agoniz[ing] at great length over the impact of the relocation on the child's ability to maintain a consistent, ongoing and meaningful relationship with his father," the Family Court gave far too little weight to what should have been a "central concern" of the court's, namely, "the impact of the move on the relationship between the child and the noncustodial parent" (*Tropea*, 87 NY2d at 739). In my opinion, there can be no doubt that the relocation will substantially interfere with the father-son relationship and bond. To expect the father to present evidence establishing exactly how the relocation would interfere with the father-son relationship, as did the Attorney for the Child, would impose an absurd requirement, and the failure or inability of the father to make such an evidentiary demonstration does not negate the fact of the harm. It is well established that children derive an abundance of benefits from "the mature guiding hand and love of a second parent" (*Weiss v Weiss*, 52 NY2d 170, 175 [1981]) and that generally a child's best interest is protected by ensuring the fullest possible relationship with both parents (*see Nimkoff v Nimkoff*, 18 AD3d 344, 347 [1st Dept 2005]). This relocation will deprive this child of his father's participation in his day-to-day life; any benefits that may be offered by the mother's new home and family cannot compensate for that more fundamental deprivation.

I cannot agree with the suggestion that the strong father-son bond can be sustained through a visitation schedule consisting of longer-than-usual summer visits and some school vacations. An extended visit once a year, with two or three additional week-long visits, cannot create or maintain the depth of the bond created when the child lives with the parent full time or, at least, for a substantial portion of each week. Nor can videoconferencing through computer interfaces fill the gap. As matrimonial law commentator Andrew Schepard has observed, "Parenting plans should not be structured on the assumption that virtual

visitation can substitute for personal interaction between parent and child" (Schepard, *Virtual Visitation: Computer Technology Meets Child Custody Law*, NYLJ, Sept. 18, 2002, at 3, col 1).

> "Hugs and kisses cannot be transmitted via video screen; nor can a parent wipe away a child's tears, tie a child's shoe, climb a tree with a child or cheer at a child's Little League game over the Internet. These precious moments and memories that are at the core of a parent's relationship with a child require personal contact" (*id.*).

It should be emphasized that the impact of this relocation of more than 3,000 miles cannot be compared with the impact of a relocation of, say, 100 or even 200 miles, such as many cases have considered. For example, in *Tropea*'s companion case, *Matter of Browner v Kenward*, the respondent father argued that the 130-mile move from Westchester County to Pittsfield, Massachusetts would eliminate his midweek visitation opportunity, reduce his ability to participate in his son's religious worship, and diminish the quality of the weekend visits he had with his son. The Court concluded that "[w]hile these losses [were] undoubtedly real and [were] certainly far from trivial, it [could not] be said that they operated to deprive respondent of a meaningful opportunity to maintain a close relationship with his son" (87 NY2d at 742). A proposed relocation that, as a practical matter, eliminates midweek visitation does not necessarily prevent the noncustodial parent from being a regular presence in the child's life, and, importantly, to be present for the unique milestones in the child's life, such as a school play or school concert performances. Similarly, in *Matter of Daniel R. v Liza R.* (309 AD2d 714, 714 [1st Dept 2003]), this Court modified an order of visitation to give custody to the father, who lived a 1½-hour drive from the mother, observing that "[w]ere this case to be assessed on the basis of relocation, the result would be no different since petitioner moved solely to obtain viable employment, *respondent has not been denied meaningful access to her son*, and it has been demonstrated that the child will thrive in the new location" (emphasis added).

In contrast, a 3,000-mile relocation like the one at issue here virtually precludes the noncustodial parent from maintaining any realistic presence for these types of formative events in the child's life. Indeed, a review of cases in which relocation of a child to California was sought reflects that such permission is often denied where both parties are good parents and there is a

close relationship between the child and the parent residing in New York (*see e.g. Matter of Webb v Aaron*, 79 AD3d 1761 [4th Dept 2010]; *Matter of Friedman v Rome*, 46 AD3d 682 [2d Dept 2007]; *Matter of Burr v Emmett*, 249 AD2d 614 [3d Dept 1998]; *Matter of Yelverton v Stokes*, 247 AD2d 719 [3d Dept 1998], *lv denied* 92 NY2d 802 [1998]). In *Matter of Friedman*, the Second Department explained that although the mother's relocation application was validly motivated "to meet the demands of her second marriage," the denial of the application was in the children's best interests because "the mother failed to demonstrate that her reasons justify 'the uprooting of the children from the only area they have ever known, where they are thriving academically and socially, and *where a relocation would qualitatively affect their relationship with their father*'" (46 AD3d at 683, quoting *Matter of Confort v Nicolai*, 309 AD2d 861, 861 [2d Dept 2003], quoting *Matter of Mascola v Mascola*, 251 AD2d 414, 415 [2d Dept 1998] [emphasis added]).

In *Matter of Burr v Emmett*, the mother "planned to move to California to remarry and pursue a career as a lyricist, taking [the parties' child] and his nine-year-old half-sister" (249 AD2d at 614). The Third Department affirmed the denial of the mother's relocation application, emphasizing that

> "[w]here, as here, a custodial parent seeks to change his or her residence in a manner that would detrimentally affect the other parent's ability to enjoy 'frequent and regular contact with the child', the relocating party bears the burden of demonstrating that the proposed move is nevertheless in the child's best interest" (*id.*, citing *Tropea*, 87 NY2d at 741 [citation omitted]).

The Court observed that the mother's plans to become a lyricist in California were speculative at best, and failed to justify "uprooting [the child] from familiar surroundings and loving relatives, and disrupting his strong bond with [the father]" (249 AD2d at 615). Interestingly, the Court did not even comment on the impact of the denial of relocation on the mother's plan to remarry in California.

In *Matter of Yelverton v Stokes*, the mother sought relocation in order to move to San Jose, California, to marry a man already living and employed in a lucrative position there; she asserted that there were no similar positions for him in New York. The Third Department affirmed the denial of relocation, citing, among other reasons, the child's unfamiliarity with the locale

and the new husband's lack of experience with children generally and his lack of any prior relationship with the parties' child (247 AD2d at 721).

And in *Matter of Webb v Aaron*, the Fourth Department affirmed the denial of relocation with the parties' child to California because not only had the mother failed to establish that their lives would be sufficiently enhanced by the move, but in addition, the record showed that the child's relationship with her father and other relatives "would be adversely affected by the proposed relocation" (79 AD3d at 1762).

There are, of course, many cases in which the facts and the nature of the family relationships warrant permitting long-distance relocation. For example, in *Matter of Fegadel v Anderson* (40 AD3d 1091 [2d Dept 2007]), the Second Department affirmed an order granting the mother's petition to relocate to Florida. It explained that "[a]lthough both parties were loving parents," the mother was the child's primary caretaker; that while there was extended family in New York, one of the child's two adult siblings lived in Florida; and that the mother had provided health and economic reasons in support of the move (*id.* at 1092-1093). I note, however, that the decision contains no discussion of whether the relocation would disrupt the bond between the child and her father. Similarly, *Aziz v Aziz* (8 AD3d 596 [2d Dept 2004], *lv dismissed* 7 NY3d 739 [2006]), in which the mother was permitted to move with the parties' child to Texas, has no discussion of whether the relocation would disrupt the child's bond with the father.

In *Matter of Vargas v Dixon* (78 AD3d 1431 [3d Dept 2010]), the mother was permitted to move with the parties' child to Florida. Importantly, however, the Third Department specifically pointed out that contrary to the claim that the child's relationship with her father would be adversely affected by the move, the Family Court had credited the mother's testimony that the father had failed to regularly exercise visitation with the child until 2009, and that the visitation schedule was crafted so as to permit the child to spend more time with the father than she had in the past.

That the relocation to California in this case will necessarily substantially disrupt the father-son bond is a fact, regardless of whether it is acknowledged by the mother, the Law Guardian, or the majority. Of course, in appropriate circumstances, that single factor may be outweighed by other considerations. However, this case is like *Matter of Sylvain v Paul* (68 AD3d 883, 884 [2d Dept 2009], *lv denied* 14 NY3d 709 [2010]), where

"[the mother's] desire to move to Florida to live with her new husband, who resided in Florida where he was employed as a truck driver, was not, under the circumstances of this case, a sufficient justification to warrant relocating the child away from his father and the father's extended family, with whom the child has strong, loving relationships."

While the demands and opportunities presented to a custodial parent by a second marriage may, "at least where the over-all impact on the child would be beneficial," justify a relocation to a distant place (*Tropea*, 87 NY2d at 739), the mother's single-minded focus on her own desire for a new romantic partner, with precious little concern for her son's need for his father, warrants granting relatively little weight to her desires when balancing all the relevant factors.

Indeed, the unusual way in which the mother's relocation request evolved militates against allowing the relocation of the child such a distance from his father. This is not a case in which the need for relocation arose after the custodial parent became involved with or married to the new stepparent, and the parent's or stepparent's employment necessitated the move. Rather, as the father observes, the mother left New York to pursue a romance, pure and simple. In fact, this was part of a pattern; she had previously relocated to Stamford, Connecticut to move in (with the child) with a boyfriend. That relationship lasted less than a year, ending when her boyfriend moved back to New Zealand. What these acts demonstrate is that the mother's desire for, or need of, a romantic partner is far more compelling to her than her concern for her child's well-being.

It was the mother's act of seeking a new romantic partner on Match.com, heedless of where potential mates might be located, that led directly to her moving to California in the hope that her new relationship would prove to be permanent. Although she would have willingly taken her son with her on her exploratory move to San Diego, as she had when she moved to Stamford, she did not hesitate to leave him behind when the father relied on the divorce judgment's relocation limit to prevent her from taking him. So powerful was her need to find a romantic partner that she was willing to drop everything, particularly her day-to-day presence in the life of her four-year-old son, in pursuit of satisfying it. That she was fortunate enough to have the whirlwind romance turn into an apparently stable marriage should not cause us to overlook her unthinking

eagerness to take steps that—even if everything worked out— would leave the youngster with only one of his parents present in his everyday life, while the other slowly became a relative stranger.

Although the majority terms "rank speculation" the assertion that the mother puts her own romantic interests ahead of her child's interests, it is an unassailable fact. By moving to California in June to live with a man that she met in person for the first time in March, she showed that her four-year-old son took a back seat to her need for a romantic partner. The majority's characterization of the mother's hasty move to California as "pursuing marriage aggressively to produce a sibling for her son, before he became much older," does not place the mother in a better light. The fact is, her move demonstrates that there was nothing more important to her than beginning a new life with her new boyfriend; her child came second, and she gave no thought to his need to maintain the close day-to-day bond with his father.

While the mother testified that Bonnar had looked for work in this area, and, in particular, that he inquired into the possibility of work at Northrop Grumman's Long Island facility, nothing in her testimony indicates that she explicitly explained to him that remaining in this area was a paramount concern to her, that she was determined that her son would have both his parents in his day-to-day life. She testified, albeit vaguely, that she had indicated to Bonnar that remaining in this area was important to her (upon learning that Bonnar had been offered the San Diego job, "I asked him—I begged him, I said is there anything that you could do—is there any possible way— anything," in response to which Bonnar told her that it had been very difficult to find any job at all). But there is nothing to reflect that her expressed preference or concern was motivated by the paramount nature of her son's needs. Indeed, there is no indication that she ever broached with Bonnar the subject of making an effort to find other kinds of employment in the New York area, outside the realm of military suppliers if necessary. We have no reason to believe that Bonnar's search for employment was undertaken with any concern about the needs of his new girlfriend's son. On the contrary, we can infer that he knew that his new girlfriend was willing to go wherever he found a job, and would make no demands with regard to what would be best for her child.

Although the mother asserted that she had planned to move because the father led her to believe that he would cooperate

with her plan to take the child with her once she established that the relationship with her new paramour was stable, the Family Court *rejected* the mother's testimony on that point, pointing out that the father's insistence on including the 25-mile relocation limit in the divorce judgment reflected an unwillingness to have the child moved that far from him. Yet, in supporting the move on appeal, the Law Guardian incorrectly treats this assertion by the mother as established fact. As to the Law Guardian's suggestion that the mother's initial move without the child established her respect for the father's concern for stability, in fact, it only reflected her recognition that she lacked the legal right to unilaterally move the child that far. Indeed, the father's consent, in the context of the stipulation of settlement and the divorce judgment, to the mother's serving as custodial parent and primary caretaker of their child was given on the assumption that the child would live within 25 miles of him and would be with him three days each week.

Nor do I view the quality of life the court anticipated for the boy in San Diego as a great improvement over his life in New York. I fail to perceive the "substantial benefits" the Family Court found. It is undisputed that during the two years the father served as the child's de facto custodial parent, the child had a good home, attended a good school and was well cared for. There is no indication that the father failed to provide adequately for the child before he was injured when hit by a car, and every indication that by the time of trial he was on track to again provide adequately for him. He testified that he had trained for, and obtained, new employment as a teacher's aide, which he had to postpone only to ensure his availability for trial. It is manifestly unfair to hold the father's "physical and financial problems" and receipt of some public assistance benefits against him, since it was his being hit by a car while crossing the street in May 2008 that caused both his physical injuries and his unemployment.

As to the purported benefits of the move, while the mother's living situation in San Diego seems to be adequate, it was not shown to be so much more stable or financially beneficial as to justify the relocation. For one thing, we have no reason to assume that the new job obtained by the child's new stepfather is particularly secure, or that the $60,000 to $80,000 that he is said to be earning will result in substantial additional benefits for the child. The Law Guardian's implication that the child's new stepfather is the only one of the three adults who can be

relied on to support the child, in view of what she termed his long-term, well-paid employment, fails to acknowledge that this apparent stability and security are attributable only to his status as a long-time member of the armed forces, not to any success in the job market. Nor should we necessarily be so sanguine about the stability of a new marriage that took place at the time the new couple's child was born, about a year after they first met in person.

Assuming, as we can here, that each parent has the means to provide a safe and happy upbringing, we should be wary of giving greater consideration to the parent whose income is greater.

There is no reason to view the child's educational opportunities in California as better than those available here. New York has a low-cost city and state university system that is the equal of California's state system; it also has illustrious public high schools such as Hunter College High School, Stuyvesant, and Bronx High School of Science, whose superiority is universally recognized.

The emphasis placed by the majority on the benefits of the child's growing up with his half brother fails to recognize that those benefits are gained at the expense of day-to-day contact with his father, a connection far more important to a child's development.

As nice as it is for the mother that her new husband's earnings seem sufficient to afford her the option of staying at home full time and attending to her children, the benefit that her full-time presence might provide to the child does not outweigh the substantial loss of his father's presence in his life.

The majority's suggestion that permitting the relocation is particularly appropriate because the father is free to relocate to San Diego in view of his lack of a "career" or family in New York turns the situation on its head. The father should not have to create a completely new life for himself in an unknown community 3,000 miles from his home in order to maintain a close relationship with his son. He has made his home as an adult in New York City. That he has worked a variety of jobs and has not joined a high-income profession does not make his ties to his chosen home less meaningful.

Lastly, the Family Court's conclusion was founded at least in part on the assertion that the father should not be allowed to control the "timing" of a relocation to which he essentially consented. This was not a sound basis for permitting the reloca-

tion. While the father did allude in his testimony to the vague prospect of the child's living with his mother's new family in "maybe a year and a half," he was not asked to explain himself. Presumably, the mother's counsel did not want to give the father the chance to backpedal. However, such an offhand comment should not be relied on for a finding that the father "essentially consented" to a relocation.

For all the foregoing reasons, I believe the mother's application should be denied.

TOM, J.P., and ABDUS-SALAAM, JJ., concur with MOSKOWITZ, J.; SAXE and DEGRASSE, JJ., dissent in a separate opinion by SAXE, J.

Order, Family Court, Bronx County, entered on or about July 9, 2010, affirmed, without costs.