■ In the Matter of MICHAEL H. KOEGLER, Respondent, v PAMELA D. WOODARD, Appellant. [946 NYS2d 139]—

Order, Family Court, New York County (Carol J. Goldstein, Ref.), entered on or about December 23, 2010, which denied respondent mother's petition for custody of the parties' child and permission to relocate to Texas with the child, and awarded the parties joint custody, affirmed, without costs.

The parties, unwed parents of a daughter born in December 2005, became involved in a romantic relationship in March 2005. At that time, the mother lived in California and was employed at Citigroup. The father lived in New York and worked for Bear Stearns. After their child was born, the mother filed an action in California seeking custody and child support from the father. In or around June 2006, the parties resolved to work on their relationship. Towards that end, the mother transferred to a new position with Citigroup in Manhattan and moved into an apartment in Manhattan with the child. It was understood that if the mother decided after two years that she did not wish to remain in New York, she and the child could return to California. The maternal grandmother, who lived in Seattle, moved to New York to help with child care, and the father had regular visitation with his daughter.

The relationship between the parties did not work out, and in or about December 2006, the mother told the father that she wished to relocate to Texas, where she had been raised and where she had family. He objected, and the mother remained in New York. In 2007, the father began dating a woman whom he later married. In early 2008, the mother learned that her job with Citigroup was to be dissolved, and she once again told the father of her desire to relocate to Texas. The father filed an emergency application in Family Court to prevent the mother from leaving New York City and sought joint legal custody and decision making regarding their daughter.

As found by the Family Court, the mother was unemployed

for 18 months, during which time she searched for a job in both the New York metropolitan area and Texas. She started a job with First American Bank in Dallas, Texas in July 2009, but did not inform the father or the court that she was working in Texas. This came to light after the father noticed that the mother was often not at her home, and was told by the child's grandmother that she did not know when the mother would return. The father made a motion to the court in August 2009 for more visitation time with the child. The parties entered into a stipulation that the father could have additional visitation with his daughter when the mother was in Texas.

By order dated December 23, 2010, the Family Court denied the mother's request to relocate the child to Texas, granted the parties joint custody and appointed a parent coordinator. The mother was awarded residential custody, provided that she maintained adequate housing in New York. The father was awarded parenting time with the child on alternate weekends from Friday at 6:00 P.M. to Sunday at 6:00 P.M., every Tuesday overnight from 6:00 P.M. to Wednesday morning before school, and a dinner visit every Thursday from 6:00 P.M. to 7:30 P.M. While the mother was in Texas working, the father had residential custody of the child and the mother had residential custody while she was in New York, subject to the father's weekend parenting time. This arrangement has apparently been ongoing for the past year while this appeal has been pending; thus, the child has been spending a substantial amount of time with her father since the Family Court issued its order.

There is a sound and substantial basis in the record for the Family Court's determination to deny the mother's request to relocate to Texas, and there is no reason to disturb the findings of the court (see generally Matter of Alaire K.G. v Anthony P.G., 86 AD3d 216, 220 [2011]). The court gave due consideration to the Tropea factors (Matter of Tropea v Tropea, 87 NY2d 727 [1996]) in concluding that the best interests of the now six-year-old girl would not be served by relocation to Texas.

Regarding the mother's dealings with the father, the court found that she had not been honest with him when she first obtained the Texas job and was out of town for extended periods, and that with respect to her work schedule in Texas, she had been "either misleading or not forthright in giving [the father] information to which he was entitled," it appearing that the mother "has been trying to hinder [the father] from having the additional visits to which he is entitled by virtue of the Court order." The court concluded that it is hard to imagine that the mother would be truthful and forthcoming with the father as to

the child's activities and general well-being if she lived in Texas. As this Court held in *Matter of James Joseph M. v Rosana R.* (32 AD3d 725, 726 [2006], *lv denied* 7 NY3d 717 [2006]), "The custodial parent must be able to place the child's needs first while fostering a continued relationship between the child and the noncustodial parent" (citation omitted). The dissent downplays that the mother was dishonest with the father when she did not inform him that she had started a job in Texas and was out of town for extended periods, leaving the child in the care of the grandmother, noting that the father was also untruthful with respect to the child's activities. The dissent points out that the appropriate standard in assessing the desirability of relocation is the best interests of the child, not the supposed misdeeds of the parties. However, the important point here is that the Family Court had a sound basis for concluding that, were the mother and child to live in Texas, the mother would not foster and facilitate a relationship with the father, and that is a relevant factor when assessing the best interests of the child. Despite the court order requiring the mother to inform the father of her schedule regarding her time in Texas and her time in New York, which order provided that the father was to have additional visitation with the child when the mother was in Texas, the record shows a pattern of deception by the mother, who admittedly lied to the father that she was in New York when she was actually in Texas, thus depriving him of the visitation time to which he was entitled by court order.

With respect to the mother's employment, the court indicated that its decision on the relocation petition was based, in part, on the bona fides of the request. The court credited the testimony of a vocational and employability expert that the mother's job search in 2008 and 2009 could have been more thorough, including more networking and Internet tools, and that with the mother's credentials and a "robust" job search, she could expect to find a job in the financial industry in the New York area within six to eight months. Although the dissent believes that relocation is warranted as a matter of economic necessity, we note that in 2006, years before she lost her Citigroup job in New York, the mother expressed her desire to relocate to Texas. It is clear from the mother's testimony that she does not want to live in New York. As was observed by the Family Court, during the year and a half that this matter was pending, while she was employed in Texas, the mother did not seek a job in New York. When asked by the father's attorney during a September 2010 hearing why she had not continued to look for a position in New York, the mother responded that she does not want to live in New York, and further stated that if a

New York job were now offered to her, she would not accept it. Thus, there is a sound basis for the Family Court's determination that relocation is not required by economic necessity.

Additionally, as a practical matter, the record indicates that respondent may no longer be employed in Texas. When the Family Court issued its order on December 23, 2010 denying the relocation petition, it noted that respondent had stated that her job in Texas would be terminated by the end of the year if she could not commit to living full time in that state. The dissent is simply incorrect in stating that there is no evidence to substantiate or even suggest that respondent is no longer employed in Texas. The mother testified in October 2010 that her employer knew of her current situation and had worked with her, but that December would be her last month at that job if she did not relocate to Texas. Her attorney also argued in summation that, if relocation is denied, the mother will be forced to forfeit her position in Texas as her company has indicated that it will no longer allow her to split her time between New York and Texas. Thus, our observation at this point, over a year after the Family Court issued its decision, that the mother may no longer be employed in Texas, is based on her representation to the Family Court.

The court found that the child is happy and well-adjusted, and has a "good solid nurturing relationship with both parents." While the court considered that the mother was currently employed in Texas, has numerous relatives in Texas who could provide a support system that is lacking for her in New York, and that the maternal grandmother had moved to Texas, the court also noted that the child has paternal aunts and cousins who live in the metropolitan area, with whom she has close relationships.

The court considered the reports of the psychologist who was appointed to conduct a forensic evaluation of the family, observing that he had engaged in a risk-benefit analysis, and that although he had not made a recommendation, he had leaned in favor of relocation. The psychologist reported that the benefits to the child were less exposure to parental conflict, and the mother's improved emotional well-being, and the disadvantage was the loss connected with the alteration of the child's relationship with her father. The Family Court found that the father is an excellent father and that he has a "substantial and significant relationship" with the child, that he is the primary male figure in the child's life, and that a relocation to Texas would, as a practical matter, limit their contact to school breaks and an extended summer visit. The court noted that the psychologist

had acknowledged that the loss of the close relationship the child now has with her father could have a lasting impact on the child's future relationships as well as her success in life, and concluded that based upon the entirety of the circumstances, the child's life would not be enhanced by relocation to Texas. Contrary to the dissent's position, the Family Court did not discount the appointed psychologist's finding that relocation would be beneficial to the child. The Family Court gave serious consideration to the expert's reports, noting that he had not made a recommendation as to relocation, but was instead leaning towards relocation. The relocation issue was evidently a very close call for the expert, and the Family Court adequately weighed all of the *Tropea* factors when making its determination.

As for the parties' understanding reached years earlier that the mother could leave New York if she wished, the Family Court found the agreement nonbinding, observing that the agreement was made when the child was just a few months old, when the consequences of such a move once the father had become an integral part of the child's life may not have been foreseen. This finding has a sound basis, as any such agreement could not trump the central issue here, which is the best interests of the child. Thus, the court appropriately held that "[w]hile the respective rights of the custodial and noncustodial parents are unquestionably significant factors that must be considered, it is the rights and needs of the child that must be accorded the greatest weight." The Family Court's findings are to be accorded great deference on appeal (*see Matter of James Joseph M. v Rosana R.*, 32 AD3d 725, 726 [2006], *supra*).

On our review of the record, we conclude that the mother has not met her burden of establishing that it would be in the child's best interests to relocate to Texas. Furthermore, while the record shows that there is a degree of mistrust and resentment between the parents, there is support in the record for the Family Court's conclusion that a parent coordinator would be useful in minimizing conflicts between the parents and that joint custody is a viable arrangement (*compare Lubit v Lubit*, 65 AD3d 954 [2009], *lv denied* 13 NY3d 716 [2010], *cert denied* 560 US —, 130 S Ct 3362 [2010] [parties unable to coparent as they were openly hostile to each other, and, without drawn-out negotiations, could not reach agreement on any decisions]). Concur— Andrias, Catterson and Abdus-Salaam, JJ.

Tom, J.P., and Román, J., dissent in a memorandum by Tom, J.P., as follows: Respondent mother applied to Family Court for sole custody and permission to relocate to Texas with the par-

ties' child in connection with her employment in that state. The court denied the petition and instead awarded the parties joint custody. Under the circumstances, neither the award of joint custody nor the denial of permission to relocate promotes the child's best interests.

Respondent met petitioner father in a Las Vegas airport in early 2005 while she was returning home to California after a business trip and petitioner was returning home to New York City. This serendipitous meeting culminated in a brief romantic relationship when respondent spent four days visiting petitioner in New York City and, as a result, respondent became pregnant. Although petitioner initially denied being the child's father, paternity was confirmed by genetic testing performed in California. Due to complications with the pregnancy and the need to take a short-term disability leave from her job, respondent's salary declined, and she was obliged to borrow funds from her 401(k) account to support herself.

Following the child's birth in December 2005, respondent began an action in California seeking custody and child support, after which the parties engaged in mediation in an attempt to resolve their differences. In mid-2006, however, respondent testified that she withdrew the California action and moved to New York based on petitioner's assurances that the parties would work on their relationship and that he would not prevent her from leaving New York in two years' time. Respondent and child resided in Battery Park City under a two-year lease guaranteed by petitioner, who had his own key to the apartment. Although respondent was able to transfer to another position within Citibank in New York, she was no longer eligible for a bonus, and her income declined by some $100,000. Petitioner, who earned a substantial income from his employment with an investment bank, paid respondent $8,000 a month, which was the amount of the rent for the Battery Park City apartment.

In December 2006, respondent testified that she expressed her desire to relocate to Texas, where her family resides, but petitioner would not accede to her wishes. In early 2008, respondent learned that her job at Citibank was going to be eliminated and again raised the issue of relocating outside New York City. Petitioner responded by filing an emergency application in Family Court for joint custody and decision-making authority, resulting in the issuance of an injunction preventing respondent from leaving the jurisdiction with the child. Two months later, respondent brought a cross motion to vacate the ex parte order, for permission to relocate to Austin, Texas with the child and for sole legal and physical custody.

Respondent's employment with Citibank officially ended in the spring of 2008, around which time petitioner also lost his job at the brokerage firm and reduced respondent's monthly payments to $4,000. Since her only other income was a severance package and unemployment benefits, respondent gave up her apartment. She was able to sublet another apartment in Battery Park City, but was required to seek financial assistance from her mother.

Respondent testified to her many attempts to find other employment in New York City. She undertook an extensive internal search and joined several networking groups within Citigroup, utilized the services of various outplacement counselors and employment agencies, hand-delivered her resume to temporary employment agencies and job fairs, posted her resume online on sites including CareerBuilder and LinkedIn and networked through social organizations and temporary agencies. She received only one interview and was not offered the job. She then expanded her search to include more varied types of work and positions outside New York City, including New Jersey and Texas, with the expectation that petitioner would honor his promise to allow her to relocate with the child. In late spring 2009, she was offered a job in Texas at an insurance company at a salary of $140,000, with the potential for a bonus.

Respondent testified that in addition to her need for employment, she wished to relocate to shield the child from the conflict and acrimony that exists between the parties. She stated that their differences include decisions regarding the child's schooling, extracurricular activities, medical treatment, religion and discipline. Respondent further stated that petitioner was not punctual for pickups and drop-offs, and would not tell her when he would be returning the child from visits. She testified that petitioner called her names including "liar," "bitch," and "crazy" in front of the child.

As to relocation, respondent testified that she would be better able to support herself and the child due to the lower cost of living and lack of state taxes in Texas and would have the support of her family and their assistance with child care. She noted the excellent preschool options there, as well as an opportunity for free higher education for college or graduate school. She testified that if permitted to move to Texas, she would foster the child's relationship with petitioner and travel to New York to enable him to have access to the child.

Steven Demby, Ph.D., a court-appointed forensic custody expert, characterized the acrimony between the parties as

"fairly intense" and stated that relocation would be beneficial in that it would provide fewer opportunities for day-to-day conflict in the presence of the child. He noted that both parties had recounted instances where the child was exposed to heated exchanges between them and that the situation between the parties left the child "feeling like she's going back and forth between . . . enemy camps." Dr. Demby stated that respondent was the primary caretaker and "better parent" and believed that even if she relocated to Texas, the child "could maintain her relationship with her father." He noted that while respondent seemed less angry at the time of his latest evaluation, petitioner remained angry, and "had one negative, critical thing after another to say about [respondent]."

Petitioner testified that he was very involved in respondent's pregnancy, visiting her in California "several times" during the pregnancy. He was present at the child's birth in December 2005 and during the first week of her life. During the ensuing six months, he visited the child for long weekends every few weeks becoming "very involved" in her care, and following respondent's move to New York City, he saw the child "frequently."

Petitioner, who is now married, stated that he began a relationship with his wife during 2007, whereupon respondent informed him that she was upset by the relationship and no longer wanted to live in New York. He added that in September 2008, respondent hired a moving company to move her furniture to Dallas without informing him. Prior to the commencement of this proceeding, the parties could not agree on an access schedule for the child. He now sees the child "Tuesdays and Thursdays during the week and every other weekend from Friday at 5:30 P.M. until Sunday at 6:00 P.M.," and nearly every other day when respondent is out of town on business. He accused respondent of making it difficult for him to have a relationship with the child by misleading him and trying to create conflict, for example, by deliberately misinforming him about the date of her four-year medical checkup, which he missed. He asserted that if the child lived in Texas, "it would be difficult to impossible to have any involvement in her life," although he acknowledged that he has sufficient resources to facilitate transportation between New York and Texas. He added that his family has been very involved in the child's life, and that she is very close to his mother, siblings, cousins and nephews.

The child attends school five days a week, which she "adores," and to date petitioner has paid 100% of the cost. Although the parties did not agree on where the child should be enrolled for

the fall 2009 semester, petitioner, without informing respondent, enrolled her in school in the belief that respondent would be supportive. The parties also disagreed about the number of hours the child should attend school, what activities she should be enrolled in, how her religious education should be handled and how medical and dental appointments should be scheduled.

A vocational evaluator and employability expert, who did not meet with respondent prior to giving testimony, considered her job search, which was conducted primarily on line, to have been inconsistent and less than diligent. However, she conceded that many alternative strategies she suggested had a cost associated with them and that by summer 2008, when respondent was newly unemployed, the job market was in "pretty tough shape," and by year end, had come to a "dead halt" and has remained "one of the most difficult" in her experience.

By an order of custody and visitation issued after a 19-day trial, Family Court denied respondent permission to relocate outside the New York metropolitan area with the child and awarded joint custody, with physical custody to respondent. The court found respondent to have been untruthful to petitioner concerning a number of matters—when she obtained the job in Texas and when she would be in Texas, the flight time between Dallas and New York and the scheduling of the child's annual doctor's visit. Nor had respondent been truthful with the court regarding her income. The court reasoned that respondent was therefore unlikely to be truthful about the child's activities and general well-being if she were living in Texas. Since petitioner was "an important figure" in the child's life and respondent "minimized the importance of the father's relationship with [her]," it concluded that if permission to relocate were to be granted, the child "would suffer loss and may feel that she did something wrong" and that the child's contact with petitioner would be limited to school breaks and an extended summer visit. The court also doubted that relocation would minimize the conflict between the parties because much of it occurred during telephone communications, which would only be more necessary if relocation were permitted.

I am unpersuaded that this disposition is in the best interests of the child (*Matter of Tropea v Tropea*, 87 NY2d 727 [1996]). There is merit in respondent's contention that the court discounted its own forensic custody expert's determination that relocation to Texas would be beneficial to the child and accorded excessive weight to the impact of the move on petitioner's current access schedule. I am particularly swayed by the argument that the move is warranted as a matter of economic necessity.

Respondent has found employment in Texas, for which she receives a substantial income that permits her to support herself and her daughter (*see Amato v Amato*, 202 AD2d 458 [1994], *lv denied* 83 NY2d 759 [1994] [mother permitted to relocate to Idaho to be closer to her family and reduce living expenses and child care costs, which were unaffordable in New York]). The record supports the fact that respondent was unable to find employment in New York since 2009. To stay in this jurisdiction respondent would remain unemployed and unable to support herself or her child. In addition, she can look to her family located in Texas for assistance with child care (*see Matter of Melissa Marie G. v John Christopher W.*, 73 AD3d 658 [2010] [request for relocation granted where the mother and child would benefit from supportive relationships with the mother's family, who lived nearby]).

The Family Court's evaluation of the circumstances is generally accorded great weight because the court is best positioned to assess the credibility of witnesses (*Eschbach v Eschbach*, 56 NY2d 167, 173 [1982]), "unless it lacks a sound and substantial basis in the record" (*Yolanda R. v Eugene I.G.*, 38 AD3d 288, 289 [2007]; *see also Matter of David J.B. v Monique H.*, 52 AD3d 414, 415 [2008]). Here, contrary to the majority's contention, the court's decision does not find substantiated support in the record. While testimony was received suggesting that respondent could find a job in New York City if only she invested sufficient resources in the search, the expert also conceded that the local financial job market remains very difficult (*see Miller v Pipia*, 297 AD2d 362, 366 [2002] [mother permitted to remain in Florida where she relocated when she was unable to find work in New York that would have provided sufficient compensation to permit renting an apartment and providing child care]). Since respondent has been awarded physical custody and works in Texas, it is only logical to require petitioner to travel to see his daughter—which he does not deny having the resources to do—rather than require respondent to travel to maintain her employment. It is clear from the award of physical custody that Family Court found respondent to be the primary caregiver, a role that is greatly complicated by the need to travel between New York and Texas to earn an income. Since respondent has been the primary caregiver of the child and was found to be the "better parent" by Dr. Demby, she would better serve the rights and needs of the child. To disrupt and deprive the child of the continued care and nurture from her primary caregiver since birth, who is also the better parent, due to the need to maintain employment, will not serve the best interests of the child. The majority's ruling has placed the father's need

to be involved with his daughter over the need of the child for the love and nurture of her primary caregiver. In fact, petitioner testified that he has adequate financial means to visit the child in Texas and respondent testified that she would have the child visit and establish a relationship with petitioner in New York.

Further, the court did not follow the advice of its appointed forensic custody expert. It should be noted that "the evaluation by an independent expert should not be readily set aside" (*Rentschler v Rentschler*, 204 AD2d 60, 60 [1994] [court's determination of custody was not warranted by the evidence because there was much support in the record for the opinion of the court-appointed expert], *lv dismissed* 84 NY2d 1027 [1995]). Here, Dr. Demby spent more than 22 hours with the parties and their child and concluded that his concerns over the child losing "frequent contact with her father" were outweighed by "serious" concerns about how the ongoing hostile and acrimonious battle between the parties would affect the child if respondent were to remain in New York. Although the court speculated that since most of the parties' communication would remain telephonic, it could not foresee how such a move would minimize conflict, the court did not give a sound basis for disregarding Dr. Demby's opinions (*see id.*). Dr. Demby expressed the belief that if petitioner made a "concerted effort" and "demonstrated his interest in her, and was able to spend time with her on a consistent basis," that would "mitigate" the "loss that it would mean to her" (*see Tropea*, 87 NY2d at 738 [the father's regular and meaningful contact with the child, while important, is not dispositive and should not be given disproportionate weight to predetermine the outcome]).

As the trial progressed, Dr. Demby testified that he observed a change in respondent's demeanor, leading him to conclude that she would foster a relationship between petitioner and his daughter. Significantly, petitioner acknowledged that he has the means to travel to Texas for visits with the child (*compare Matter of Helen H. v Christopher T.*, 47 AD3d 590 [2008] [affirming a denial of relocation, this Court found that the mother's move to Australia was unjustified and that she had attempted to thwart the child's relationship with his father], *with Ritz v Ritz*, 36 AD3d 437 [2007], *lv dismissed* 8 NY3d 1005 [2007] [affirming denial of relocation to Israel where, inter alia, it was highly doubtful that the family's finances would facilitate meaningful visitations between the father and child]).

As to credibility, the court's finding that respondent was not a credible witness is based primarily on her repeatedly misleading petitioner by failing to inform him of important matters regard-

ing the child, leading the court to discount respondent's assertion that she would foster a relationship between father and daughter. Even granting that respondent misrepresented the scheduling of the child's annual doctor's visit, the record shows that petitioner similarly was not truthful and forthcoming with respect to the child's activities and well-being by, for example, registering her for school without respondent's knowledge and consent. Petitioner's contention that respondent's real reason for wanting to leave New York was due to his relationship with his current wife, which began in August or September of 2007, was contradicted by respondent's testimony that she raised the issue of relocation with petitioner for the first time at the end of 2006 and again in early 2008. Moreover, it was petitioner's misrepresentation in 2006 that the parties would work on restoring their relationship and that he would not prevent respondent from leaving New York, which persuaded respondent to withdraw her California custody action and to move to this state. Petitioner dishonored the promise by bringing an action to prevent respondent from leaving this jurisdiction and for joint legal custody of the child and by starting a relationship with his present wife approximately two years after respondent relocated to New York.

It is apparent that the parties have been less than candid and cooperative with each other as a consequence of the well-documented animosity between them. Because the animosity is mutual, the record does not support the court's reasoning that it is respondent who thereby lacks credibility. The trial court primarily focused on the inaccuracies of respondent's testimony to make its determination of credibility. Moreover, it is largely the need to remove the child from such acrimony that led the court's own expert to recommend relocating respondent and the child to Texas. The appropriate standard in assessing the award of custody and the desirability of relocation remains the best interests of the child, not the supposed misdeeds of the parties.

The majority's conjecture that "respondent may no longer be employed in Texas" because "her job in Texas would be terminated . . . if she could not commit to living full time in that state," is without support in the record. There is no evidence to substantiate or even suggest that respondent is no longer employed in Texas. In fact, it is more likely that respondent continued her employment there since it took approximately a year and much effort and resources to obtain the job in Texas after exhausting much time and energy to locate a job in New York and the surrounding areas, which proved futile. To leave the Texas job and return to New York would again cause re-

spondent to be unemployed and unable to provide for her child, a position in which respondent would unlikely place herself.

Vesting the parties with joint decision-making authority suffers from the same infirmity as requiring mother and child to remain in New York: it is simply not practical, particularly in the absence of a stable and amicable relationship. Requiring respondent to reside in New York and spend half of each month in Texas to pursue employment amounts to an award of joint physical custody. This Court has observed that where the evidence demonstrated that the parties' relationship was marked by acrimony and mistrust, joint custody was a nonviable option (*Lubit v Lubit*, 65 AD3d 954 [2009], *lv denied* 13 NY3d 716 [2010], *cert denied* 560 US —, 130 S Ct 3362 [2010]). The record in this matter amply demonstrates that the parties have been unable to agree on elementary issues regarding the child's upbringing, and it is essential that the authority to make such decisions be vested in one parent.

Accordingly, the order should be reversed and the petition granted.